IN THE

# United States Court of Appeals for the Eighth Circuit

GLBT YOUTH IN IOWA SCHOOLS TASK FORCE, d/b/a IOWA SAFE
SCHOOLS, ET AL.,

*Plaintiffs-Appellees*,

v.

KIMBERLY REYNOLDS, in her official capacity as GOVERNOR OF
THE STATE OF IOWA, ET AL.,

*Defendants-Appellants*,

JULIE MITCHELL, in their official capacities as BOARD MEMBERS
OF THE URBANDALE COMMUNITY SCHOOL DISTRICT, ET AL.,

*Defendants*.

On Appeal from the United States District Court
for the Southern District of Iowa
Case No. 4:23-cv-474
(The Honorable Stephen H. Locher)

## BRIEF OF STATE DEFENDANTS-APPELLANTS

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*

PATRICK C. VALENCIA
*Deputy Solicitor General*

DANIEL JOHNSTON
*Assistant Attorney General*
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov
daniel.johnston@ag.iowa.gov

March 8, 2024                    *Counsel for Defendants-Appellants*

**SUMMARY OF CASE AND STATEMENT ON ORAL ARGUMENT**

A group of Iowa students and a group comprising such students sued several school districts and State officials to facially challenge an Iowa law relating to schools and parental rights in education. The law may be enforced against only school districts and their employees. Though the Plaintiffs therefore lack standing and have no likelihood of success on the merits, the district court preliminarily enjoined State Defendants from enforcing the statute against them.

Indeed, the law regulates government, not private, speech. The district court's preliminary injunction disregarded the Supreme Court's government-speech precedent and further erred by applying a novel "sort of 'obscenity-light' standard for minors" rather than applying precedents that already decide the issue at hand.

This case calls for the Court's close attention and warrants oral argument. Twenty minutes of argument is adequate time for State Defendants.

# TABLE OF CONTENTS

SUMMARY OF CASE AND STATEMENT ON ORAL ARGUMENT ................................................................................. i

TABLE OF CONTENTS ............................................................... ii

TABLE OF AUTHORITIES ............................................................ v

STATEMENT OF JURISDICTION ....................................................... 1

STATEMENT OF ISSUES ............................................................. 2

INTRODUCTION .................................................................... 4

STATEMENT OF THE CASE ........................................................... 6

    I.    Senate File 496. ........................................................ 6

        A. Library Program ................................................... 8
        B. Instruction Section ............................................. 10
        C. Parental Notice Section ......................................... 10

    II.   Plaintiffs Sue To Enjoin SF496. ....................................... 11

    III.  District Court Preliminarily Enjoins the Library Program And Instruction Section ............... 14

SUMMARY OF THE ARGUMENT ....................................................... 16

STANDARD OF REVIEW ............................................................ 20

ARGUMENT ...................................................................... 21

    I.    PLAINTIFFS LACK STANDING TO CHALLENGE SF496. ......................... 22

        A.   Plaintiff A.C. Lacks Standing To Challenge Instruction Section ................. 24

           1. A.C.'s alleged harms are not traceable to the Instruction Section and are not

redressed by an injunction against that
Section's enforcement.................................................25

2. A.C.'s alleged harms are not
constitutionally cognizable ......................................28

B. Plaintiffs Lack Standing To Challenge The
Library Program Because Curation Of The
Library Constitutes Government Speech. ...................33

II. THE LIBRARY PROGRAM FITS WITHIN THE
FIRST AMENDMENT...........................................................35

A. When The State Speaks Through Curating
Books In Public-School Libraries, Its Speech
Is Not Subject To The First Amendment.....................35

1. What is government speech? ...................................36

2. Curating a public-school library's
contents is government speech ...............................39

3. The Library Program curates school-
library inventory. ....................................................42

4. Pico and Pratt are of no value here
because those cases did not have the
benefit of the Supreme Court's
Governmental Speech Cases....................................43

B. The Library Program Survives First
Amendment Scrutiny....................................................49

1. The Library Program is a reasonable and
viewpoint-neutral restriction on any
"right to receive information." ................................50

2. Plaintiffs are not likely to suceed on their
First Amendment overbreadth claim. .....................57

III. THE INSTRUCTION SECTION IS NOT VOID
FOR VAGUENESS. ............................................................62

IV.   REMAINING PRELIMINARY-INJUNCTION
      FACTORS CAUTION AGAINST ENJOINING
      SF496. ....................................................................... 66

      A.   Plaintiffs Can Show No Irreparable Harm .................. 66

      B.   The Balance Of Equities And The Public
           Interest Do Not Favor Enjoining SF496. ..................... 69

CONCLUSION ........................................................................ 70

CERTIFICATE OF COMPLIANCE ........................................ 71

CERTIFICATE OF SERVICE ................................................. 72

# TABLE OF AUTHORITIES

**Cases**

*281 Care Comm. v. Arneson,*
  638 F.3d 621 (8th Cir. 2011) .................................................... 2, 29, 30
*ACLU v. Miami-Dade,*
  557 F.3d 1177 (11th Cir. 2009) ............................................ 44
*Adam & Eve Jonesboro, LLC v. Perrin,*
  933 F.3d 951 (8th Cir. 2019) ............................................... 62
*Animal Legal Def. Fund v. Reynolds,*
  89 F.4th 1071 (8th Cir. 2024) ............................................ 31
*Arc of Iowa v. Reynolds,*
  2024 WL 799579 (8th Cir. Feb. 27, 2024) .................................... 27, 28
*Arkansas Educ. Television Comm'n v. Forbes,*
  523 U.S. 666 (1998) .................................................... 3, 37, 39
*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,*
  457 U.S. 853 (1982) .................................................... 33, 41, 43, 44, 49
*Bethel Sch. Dist. No. 403 v. Fraser,*
  478 U.S. 675 (1986) .................................................... 42, 52, 54, 58
*Bicknell v. Vergennes Union High Sch. Bd. of Directors,*
  638 F.2d 438 (2d Cir. 1980) ............................................ 58, 59
*Brown v. Entertainment Merch. Ass'n,*
  564 U.S. 786 (2011) .................................................... 60
*Bryant v. Gates,*
  532 F.3d 888 (D.C. Cir. 2008) ............................................ 38
*C.K-W by and through T.K. v. Wentzville R-IV Sch. Dist.,*
  619 F.Supp.3d 906 (E.D. Mo. 2022) ........................................ 33, 43, 45, 48
*Chiras v. Miller,*
  432 F.3d 606 (5th Cir. 2005) ............................................ 38, 45
*Clapper v. Amnesty Intern. USA,*
  568 U.S. 398 (2013) .................................................... 28
*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
  473 U.S. 788 (1985) .................................................... 51, 53, 54, 55
*Dept. of Educ. v. Brown,*
  600 U.S. 551 (2023) .................................................... 22

*Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*,
880 N.W.2d 212 (Iowa 2016)......................................3, 62, 63

*Dixon v. City of St. Louis*,
950 F.3d 1052 (8th Cir. 2020)......................................20

*Doe ex rel. Doe v. Governor of New Jersey*,
783 F.3d 150 (3d Cir. 2015) ......................................56

*Dolan v. U.S. Postal Serv.*,
546 U.S. 481 (2006) ......................................64

*Dubin v. United States*,
599 U.S. 110 (2023) ......................................63

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ......................................60, 61

*Farkas v. Miller*,
151 F.3d 900 (8th Cir. 1998) ......................................61

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ......................................61

*Gardner v. Mutz*,
857 F.App'x 633 (11th Cir. 2021) ......................................47

*Gerlich v. Leath*,
152 F.Supp.3d 1152 (S.D. Iowa 2016) ......................................61

*Ginsberg v. New York*,
390 U.S. 629 (1968) ......................................59

*Gundy v. City of Jacksonville Fla.*,
50 F.4th 60 (11th Cir. 2022) ......................................40

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988) ......................................42, 52, 58

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ......................................61, 63

*Jacobson v. Fla. Sec'y of State*,
974 F.3d 1236 (11th Cir. 2020)......................................25

*Jet Midwest Int'l Co., v. Jet Midwest Grp., LLC*,
953 F.3d 1041 (8th Cir. 2020)......................................21

*Johanns v. Livestock Mktg. Assn.*,
544 U.S. 550 (2005) ......................................36, 40

*Johnson v. Minneapolis Park & Recreation Bd.,*
   729 F.3d 1094 (8th Cir. 2013) ................................ 20
*Lacks v. Ferguson Reorganized Sch. Dist. R-2,*
   147 F.3d 718 (8th Cir. 1998) ................. 3, 51, 53, 54
*Marks v. United States,*
   430 U.S. 188 (1977) ............................................. 43
*McGriff v. City of Miami Beach,*
   84 F.4th 1330 (11th Cir. 2023) ........................... 47
*McMahon v. Fenves,*
   946 F.3d 266 (5th Cir. 2020) .............................. 47
*Mech v. Sch. Bd. of Palm Beach Cnty., Fla.,*
   806 F.3d 1070 (11th Cir. 2015) ................ 35, 40, 47
*Miller v. California,*
   413 U.S. 15 (1973) ............................................. 52
*Missouri v. Biden,*
   52 F.4th 362 (8th Cir. 2022) .............................. 28
*Nat'l Endowment for the Arts v. Finley,*
   524 U.S. 569 (1998) ........................................... 37
*New York v. Ferber,*
   458 U.S. 747 (1982) ........................................... 57
*Ng v. Board of Regents of Univ. of Minn.,*
   64 F.4th 992 (8th Cir. 2023) ............................ 3, 66
*Org. for Black Struggle v. Ashcroft,*
   978 F.3d 603 (8th Cir. 2020) .............................. 67
*Parents Defending Educ. v. Linn Mar Comm. Sch. Dist.,*
   83 F.4th 658 (8th Cir. 2023) ........... 2, 26, 27, 28, 29, 61
*Patterson v. Rawlings,*
   287 F.Supp.3d 632 (N.D. Tex. 2018) .................. 47
*People for the Ethical Treatment of Animals, Inc. v. Gittens,*
   414 F.3d 23 (D.C. Cir. 2005) .......................... 36, 38
*Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds,*
   530 F.3d 724 (8th Cir. 2008) ................. 1, 21, 65, 68
*Pleasant Grove City, Utah v. Summum,*
   555 U.S. 460 (2009) ...................... 2, 35, 36, 37, 46

*Powell v. Noble,*
  798 F.3d 690 (8th Cir. 2015) ............................................. 66

*Pratt v. Independent School District No. 831, Forest Lake, Minnesota,*
  670 F.2d 771 (8th Cir. 1982) .............................. 44, 45, 50

*Recognition Network, Inc. v. Hutchinson,*
  803 F.3d 952 (8th Cir. 2015) ............................................ 25

*Reno v. ACLU,*
  521 U.S. 844 (1997) .................................................... 52, 60

*Republican Party of Minn., Third Cong. Dist. v. Klobuchar,*
  381 F.3d 785 (8th Cir. 2004) ........................................ 2, 32

*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
  515 U.S. 819 (1995) .................................................... 35, 38

*Rumsfeld v. FAIR, Inc.,*
  547 U.S. 47 (2006) ........................................................... 40

*Rust v. Sullivan,*
  500 U.S. 173 (1991) ......................................................... 36

*Shreveport Chapter #237 of United Daughters of the Confederacy v. Caddo Par. Comm'n,*
  331 F.Supp.3d 605 (W.D. La. 2018) ............................... 47

*Sleep No. Corp. v. Young,*
  33 F.4th 1012 (8th Cir. 2022) ......................................... 20

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ......................................................... 22

*Support Working Animals, Inc. v. Governor of Fla.,*
  8 F.4th 1198 (11th Cir. 2021) ......................................... 24

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.,*
  307 F.3d 243 (3d Cir. 2002) ...................................... 57, 59

*Texas Democratic Party v. Abbott,*
  961 F.3d 389 (5th Cir. 2020) ........................................... 67

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
  393 U.S. 503 (1969) ......................................................... 57

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ......................................................... 22

*United States v. Am. Libr. Ass'n, Inc.*,
   539 U.S. 194 (2003) ............................ 2, 37, 38, 39, 41, 52, 58
*United States v. Kidd*,
   23 F.4th 781 (8th Cir. 2022) ................................................ 63
*United States v. Stevens*,
   559 U.S. 460 (2010) ............................................................ 56
*Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*,
   640 F.3d 329 (8th Cir. 2011) .......................................... 50, 51
*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) ............................................................ 55
*Virginia v. Hicks*,
   539 U.S. 113 (2003) ............................................................ 56
*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
   576 U.S. 200 (2015) ............................................................ 40
*Ward v. Polite*,
   667 F.3d 727 (6th Cir. 2012) .......................................... 38, 52
*Watkins Inc. v. Lewis*,
   346 F.3d 841 (8th Cir. 2003) .......................................... 21, 68
*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016) .......................................... 67
*Young v. Am. Mini Theatres, Inc.*,
   427 U.S. 50 (1976) .......................................................... 3, 61, 65
*Zykan v. Warsaw Cmty. Sch. Corp.*,
   631 F.2d 1300 (7th Cir. 1980) ............................................ 39

**Statutes**

20 U.S.C. § 4071 ...................................................................... 11
Iowa Code § 4.4(1) .................................................................... 62
Iowa Code § 216.2 .................................................................... 10
Iowa Code § 256.11 ................................................................ 2, 3
Iowa Code § 256.11(2) .............................................................. 64
Iowa Code § 256.11(3) .............................................................. 64

Iowa Code § 256.11(9)......................................................10
Iowa Code § 256.11(9)(a)(1).................................................8
Iowa Code § 256.11(9)(a)(1), (19)(a)(1)...................................49
Iowa Code § 256.11(9)(a)(2).................................................9
Iowa Code § 256.11(9)(a)(3)..............................................9, 10
Iowa Code § 256.11(9)(a), (14)............................................25
Iowa Code § 256.11(19)(a)(1)................................................8
Iowa Code § 256.11(19)(a)(2)................................................9
Iowa Code § 279.50..........................................................9
Iowa Code § 279.78.........................................................11
Iowa Code § 279.80...............................................2, 3, 10, 62, 63
Iowa Code § 280.6...........................................................9
Iowa Code § 702.17.......................................................8, 9

**Other Authorities**

Frederick Schauer, *Principles, Institutions, and the First Amendment*,
 112 Harv. L. Rev. 84 (1998)............................................46

## STATEMENT OF JURISDICTION

The district court, which had jurisdiction under 28 U.S.C. § 1331, issued its opinion and order granting in part Plaintiffs' motion for preliminary injunction on December 29, 2023. App.478, R.Doc.65. State Defendants timely appealed on January 12, 2024. R.Doc.66. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to review an interlocutory order granting a preliminary injunction. *See Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008).

# STATEMENT OF THE ISSUES

1. Whether the district court abused its discretion in deciding Plaintiffs have standing to seek an injunction against enforcement of Senate File 496, which cannot be enforced against Plaintiffs and which Plaintiffs do not allege injures them except through subjective fear of enforcement.

**Cases**:     *Parents Defending Educ. v. Linn Mar Comm. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023)

*281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011)

*Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785 (8th Cir. 2004)

**Statutes**: Iowa Code § 256.11; Iowa Code § 279.80

2. Whether the district court abused its discretion in finding Plaintiffs likely to succeed in their First Amendment challenge of the Library Program, when curation of public libraries is government speech and, in all events, the Program imposes a reasonable restriction in furtherance of the State's legitimate interest in ensuring an education suitable to students' age.

**Cases**:     *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009)

*United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194 (2003)

> *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666 (1998)
>
> *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718 (8th Cir. 1998)

**Statute**: Iowa Code § 256.11

3. Whether the district court abused its discretion in deciding Plaintiffs were likely to succeed on their vagueness challenge of the Instruction Section, where ordinary tools of statutory interpretation reveal a plausible, narrowing construction.

**Cases**:    *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50 (1976)

> *Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*, 880 N.W.2d 212 (Iowa 2016)

**Statute**: Iowa Code § 279.80

4. Whether the equitable factors weigh against a preliminary injunction where Plaintiffs are not likely to succeed on the merits and the only irreparable harm is to the State.

**Cases**:    *Ng v. Board of Regents of Univ. of Minn.*, 64 F.4th 992 (8th Cir. 2023)

# INTRODUCTION

Some Iowa students facially challenged an Iowa education reform that protects students and parental rights. That law, Senate File 496, ensures that students receive an age-appropriate education and protects them from being exposed to inappropriate material in school. It does so by removing school-library books with descriptions or depictions of sex acts ("Library Program") and prohibiting schools from including as part of their mandatory curriculum for students in kindergarten through sixth grade any instruction on gender identity or sexual orientation ("Instruction Section").

The district court preliminarily enjoined the State's enforcement of those sections. That was error.

*First*, Plaintiffs lack standing. SF496 cannot be enforced against *any* Plaintiff because no Plaintiff is a school district or district employee. More, Plaintiffs' alleged harms relate to subjective fears or a flawed understanding of the law—or both. An injunction gives Plaintiffs no relief: SF496 prohibited nothing they were doing, and the injunction protects them from no penalty the State could exact.

*Second*, Plaintiffs lack standing to challenge the Instruction Section specifically. The district court reasoned that a student who disruptively expresses opinions in class post-SF496 might face discipline under a hypothetical school policy. But SF496 mandates no such policy; no district has adopted or considered adopting such a policy; and the Plaintiff who made this argument has not been disciplined or threatened with discipline during the semester the law has been in effect. The yarn of hypotheticals the court knitted together does not establish a credible threat of enforcement.

*Third*, Plaintiffs lack a free-speech right to assert against the Library Program, because it is government speech. The district court concluded otherwise by avoiding Supreme Court precedents on government speech. Relying instead on earlier fractured Supreme Court pluralities and abrogated decisions of this Court, Plaintiffs cannot avoid newer binding Supreme Court opinions recognizing that the government itself can speak freely.

In any event, removing from school library shelves books that, for example, include depictions of "penetration of the penis into the vagina or anus," is a reasonable method of furthering the State's interest in

educating Iowa's minor students only with age-appropriate materials. That raises no First Amendment issue. The district court's creation of a new "obscenity-light" standard was unnecessary, and incorrect.

*Fourth*, the district court erred in interpreting SF496's Instruction Section word-by-word in isolation, neglecting the context of the whole statute. That is contrary to Iowa and federal precedents on statutory interpretation. And it conflicts with the Supreme Court's instructions to apply a plausible, narrowing construction when possible before resolving a statute is void for vagueness.

In sum, the district court should not have enjoined the State's enforcement of SF496. This Court should provide lower courts with guidance on these important issues. And it should vacate the preliminary injunction.

## STATEMENT OF THE CASE

### I. Senate File 496.

SF496 sets curricular standards and imposes certain related duties on school districts and their employees. Before SF496, books with graphic descriptions and visual depictions of sex acts circulated in Iowa schools. *See generally* App.272–360, R.Doc.53-1. Some parents petitioned school

boards to remove such explicit content to ensure their minor children were not exposed to age-inappropriate material, to no avail. *See, e.g.*, App.291–292, R.Doc.53-1 at 20–21. So the Iowa Legislature passed SF496 to address this and related problems in Iowa's schools. Governor Reynolds signed SF496 into law on May 26, 2023. *See* Bill History for SF496, https://perma.cc/WU74-P3A9 (accessed Mar. 7, 2024).

As relevant here, SF496 amended Iowa law in two primary ways. Before digging into what these sections do, here is what they do not do. SF496 *does not*:

- ban Iowa students from reading any of the books at issue;
- ban Iowa students from acquiring the books at issue from a source outside of their school's library, including from their local public library;
- ban the sale or circulation of any of the books at issue beyond school bookshelves;
- ban Iowa students from bringing their copy of the books at issue to school;
- ban Iowa students from sharing their copy of the books at issue with friends or classmates;
- ban Iowa students from discussing the books at school during their free time; or
- ban boys and girls school basketball teams, nor other gendered noncurricular programs or activities.

As explained below, SF496 protects children, parental rights, and the public education system.

## A. Library Program.

SF496 requires schools to adopt a kindergarten-through-twelfth-grade Library Program that "contains only age-appropriate materials and supports the student achievement goals of the total school curriculum." SF496 § 2 (amending Iowa Code § 256.11(9)(a)(1)). This section defines "age-appropriate" as "topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group." *Id.* (Iowa Code § 256.11(19)(a)(1)). And it specifies that "age-appropriate" "does not include any material with descriptions or visual depictions of a sex act." *Id.*

The term "sex act" predates SF496; SF496 does nothing to that phrase other than incorporating it to set the contours of public-school-library inventories. *See id.*; Iowa Code § 702.17 (defining "sex act"). The Library Program therefore excludes from school libraries descriptions or visual depictions of:

1. Penetration of the penis into the vagina or anus.
2. Contact between the mouth and genitalia or mouth and anus or by contact between the genitalia of one person and the genitalia or anus of another person.

3. Contact between the finger, hand, or other body part of one person and the genitalia or anus of another person, except in the course of examination or treatment by a person licensed pursuant to chapter 148, 148C, 151, or 152.
4. Ejaculation onto the person of another.
5. By use of artificial sexual organs or substitutes therefor in contact with the genitalia or anus.
6. The touching of a person's own genitals or anus with a finger, hand, or artificial sexual organ or other similar device at the direction of another person.

Iowa Code § 702.17.

SF496 does not exclude from school library inventory "descriptions or visual depictions of a sex act" when used "for purposes of the human growth and development curriculum." SF496 § 2 (Iowa Code § 256.11(19)(a)(2)); *see also* Iowa Code § 279.50. Finally, prior to SF496, religious books like the Bible, Torah, and Koran were not allowed to "be excluded from any public school," and that exclusion remains in place all the same now. Iowa Code § 256.11(9)(a)(2); Iowa Code § 280.6.

Non-compliant school districts and employees may be disciplined. For a first violation, the State "shall issue a written warning." SF496 § 2 (Iowa Code § 256.11(9)(a)(3)). For a second or subsequent violation, if found to have "knowingly violated" the Library Program, the non-compliant school district or employee would face a hearing, "which may

result in disciplinary action." *Id.* These enforcement mechanisms were set to take effect on January 1, 2024. *See id.*

The Library Program does not provide for any enforcement against students.

## B. Instruction Section.

SF496 created a new section titled "Sexual orientation and gender identity—prohibited instruction." SF496 § 16 (Iowa Code § 279.80). This "Instruction Section" prohibits school districts from "provid[ing] any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six." *Id.* The Section incorporates the prior-existing, neutral definitions of "gender identity" and "sexual orientation" found in Iowa Code § 216.2.

Beginning in summer 2023, non-compliant school districts and employees could be disciplined. Iowa Code § 256.11(9).

The Instruction Section does not provide for any enforcement against students.

## C. Parental Notice Section.

Plaintiffs' lawsuit challenged a third section of SF496, the "Parental Notice" section, which is not at issue on appeal (because the

district court explained that all Plaintiffs lacked standing to challenge the section and Plaintiffs did not appeal). *See* App.497, R.Doc.65, at 19; SF496, § 14 (Iowa Code § 279.78.

## II. Plaintiffs Sue To Enjoin SF496.

More than six months after SF496 became law, Plaintiffs—nine current Iowa students and an organization—sued and moved for a preliminary injunction against State Defendants' enforcement of SF496 altogether (though their arguments focused only on the Library Program, Instruction Section, and Parental Notice section). App.4, 101, R.Docs.1, 2. Plaintiffs alleged violations of the Free Speech, Due Process, and Equal Protection Clauses of the United States Constitution, and the Equal Access Act, 20 U.S.C. § 4071.

Plaintiffs allege a "climate of fear and hostility" in the wake of SF496; SF496 caused them to "close[] off forms of expression in which they used to engage" and be "more reluctant to be 'out' about their identities at school." App.118–119, R.Doc.2-1, at 12–13. Plaintiffs fear their in-school expression might cause teachers to be disciplined for supporting Plaintiffs' gender identity or sexual orientation. App.210, R.Doc.2-10, ¶ 12. Plaintiffs allege some schools interpret SF496 to

prohibit clubs called gender sexuality alliances ("GSAs") from gathering and so have closed or limited GSA activities. App.118, R.Doc.2-1, at 5.

Plaintiffs allege that schools across the State began enforcing the Library Program in Fall 2023, ahead of the provision's January 1, 2024 effective date; "more than 450 individual works" have been removed from school library shelves; some of the removed books are ones Plaintiffs "found meaning in" or "long hoped to read;" and the Instruction Section and Library Program operate together to render them less safe, making them feel "sad, hopeless, isolated, and frustrated." App.38, 39, 44, R.Doc.1, ¶¶ 118, 120, 134, 135; *see generally* App.34–42, R.Doc.1, ¶¶ 108–128.

Plaintiff "A.C.," the sole student plaintiff under seventh grade, alleges "conceal[ing] herself," App.167, R.Doc.2-5, ¶ 10, and fearing the "consequences for herself" via school disciplinary policies for "simply express[ing] who she is" and being "honest and open about her identity," App.211–212, R.Doc.2-10, ¶¶ 14, 15. A.C. disagrees with the "message" SF496 sends and continues using what A.C. contends to be gender-affirming pronouns and wearing gender-affirming clothes. Despite that

continued expression, neither A.C. nor any other Plaintiff alleges even a threat of discipline against them.

An organization called GLBT Youth in Iowa Schools Task Force (d/b/a "Iowa Safe Schools") also sued. App.9–10, R.Doc.1, ¶ 8. Iowa Safe Schools, a not-for-profit organization based in Des Moines, provides resources and support for students throughout Iowa. *Id.* It serves at least 4,000 students representing over 100 GSAs across the state; some school districts have closed some of Iowa Safe Schools's member GSA chapters. App.10, 48, R.Doc.1, ¶¶ 9, 148, 150.

Plaintiffs ultimately claim SF496 amounts to content- and viewpoint-based discrimination, violating their First Amendment "right to receive information," (Count I), their freedom of speech and expression (Count II), and their freedom of expressive association (Count III). Plaintiffs allege the law is unconstitutionally vague (Count IV) and overbroad (Count V), and violates the Equal Protection Clause (Count VI) and the Equal Access Act (Count VII). Plaintiffs requested injunctive relief against enforcement of SF496 in total.

## III. District Court Preliminarily Enjoins the Library Program And Instruction Section.

After a preliminary-injunction hearing combined with a related case, which is now consolidated on appeal for briefing purposes, *see Penguin Random House, LLC v. Robbins*, (8th Cir. No. 24-1082) (in which book publishers and authors brought constitutional challenges to SF496's Library Program, seeking injunctive relief), the district court issued an opinion granting in part Plaintiffs' request for a preliminary injunction. App.479–524, R.Doc.65, at 1–46.

Though the court determined no Plaintiff had standing to challenge the Parental Notice section, it said all Plaintiffs had standing to challenge the Library Program. App.496–499, R.Doc.65, at 18–21. The court said Plaintiffs were likely to succeed on their claim that the Program violated their First Amendment "right to receive information," because it is a content-specific regulation that does not further a "substantial and reasonable governmental interest," and was overbroad. App.511–513, R.Doc.65, at 33–35. Dismissing State Defendants' arguments that the Library Program was "government speech," the court instead relied on precedent predating the Supreme Court's minting of the

government-speech doctrine. App.501–503, 509–511, R.Doc.65, at 23–25, 31–33.

Only A.C. was said to have standing to challenge the Instruction Section, because A.C. allegedly may face discipline under school disciplinary policies and procedures for raising gender identity or sexual orientation in class. App.498–500, R.Doc.65, at 20–22. The court further reasoned that SF496 has a chilling effect on A.C., who self-censors. *Id.*

The court then decided Plaintiffs were likely to succeed on their claim that the Instruction Section was unconstitutionally vague, interpreting the statute to apply not only to curriculum, but to all possible school activities. App.486–488, 519–522, R.Doc.65, at 8–10, 41–44. Because the terms "gender identity" and "sexual orientation" are defined neutrally, the court interpreted them to prohibit things like "boys" and "girls" basketball teams. *Id.* This, the court explained, was so broad that it lends itself to arbitrary enforcement. The court did not address Plaintiffs' First Amendment, Equal Protection, and Equal Access claims. App.523 n.8, R.Doc.65, at 45 n.8.

Because it determined Plaintiffs were likely to succeed on the merits, the district court found Plaintiffs faced irreparable harm and

therefore that the balance of equities favored an injunction. App.523, R.Doc.65, at 45. The court preliminarily enjoined the State's enforcement of SF496's Library Program and Instruction Section.

This appeal followed.

## SUMMARY OF THE ARGUMENT

I.     Plaintiffs lack standing to challenge SF496. The district court said just one plaintiff, A.C., alleged harm sufficient for standing to challenge the Instruction Section. But even that was wrong. A.C's theory of harm stems from the "message" the law sends; A.C. self-censors and fears the "consequences for herself" if she "simply expresses who she is." But no part of SF496 prohibits A.C. from taking such action. Just as SF496 does not prohibit GSAs from gathering. The complaint thus does not, because it cannot, allege "credible threat" of enforcement of SF496 against A.C. The court's theory of A.C.'s harm was that school disciplinary policies remain in place, and A.C. could face discipline thereunder if A.C. were to "express herself in the classroom," which then could disrupt the classroom, which then could lead to admonishment, then maybe formal discipline. At least one chain of hypotheticals too many. Such attenuation does not give rise to Article III standing. Not to

mention that this chain of events has nothing to do with SF496's *enforcement*. An injunction against enforcement of the Instruction Section would not solve any of this for A.C.

As to Plaintiffs' standing to challenge the Library Program, Plaintiffs suffer no constitutionally cognizable injury-in-fact. Their theory is founded on a "right to receive information" that does not exist and, at best, is not violated here because the Program is government speech not subject to the First Amendment. It curates school library inventory to ensure only age-appropriate and educationally suitable content appears on the shelves for minors to view. Plaintiffs are not harmed, under the First Amendment, when they must get their preferred books from home or public libraries instead of their school's library.

II. The district court abused its discretion by applying incorrect legal standards to analyze Plaintiffs' likelihood of success on the merits of their First Amendment claims against the Library Program.

The government-speech doctrine governs the Library Program. The government's compilation and curation of third-party speech is itself an expressive act, and thus speech. This is the case when the government exercises editorial discretion—necessarily content-specific, sometimes

arbitrary—to compile monuments or statues in a public park, art in a government museum, content on a public broadcast, or books in a public library. This discretion is even more important when the State compiles third-party speech to present to minors, as it does when it sets and implements a curriculum and a library program. The district court erred when it ignored this governing doctrine, opting instead to apply *Pratt* and *Pico*, two cases which predate the doctrine and provide little value here. What's more, they provide no reason for the district court to distinguish the State's ability to *select* the books for a school library from the State's ability to *remove* the books for a school library. The two are the same under governing government-speech precedents.

Even if the First Amendment could restrict the Library Program, it does not here. The Library Program need only be a reasonable, viewpoint-neutral restriction, not the most reasonable or the least restrictive. And it is. The government's interest in ensuring an education suitable to students' age and in preventing minor students' exposure to inappropriate material is a legitimate, compelling, even substantial one. And removing from school library shelves books that describe or depict "sex acts" is reasonably related to that legitimate interest. The law

withstands First Amendment scrutiny. Finally, the district court's factual explanation for deciding SF496 was unconstitutionally overbroad undercuts itself: The Library Program does not remove any books that do not include inappropriate materials. There was no reason to craft a new "obscenity-light" standard here, when this Court's and the Supreme Court's precedents address the issue just fine.

III. The district court abused its discretion in determining Plaintiffs were likely to succeed in challenging the Instruction Section as unconstitutionally vague. Before holding a statute void-for-vagueness, courts examine whether there is a plausible construction narrowing the statute to thereby avoid a vagueness issue. The court skipped that analysis. That was error.

Applying ordinary tools of construction, the Instruction Section's list of prohibited activities connotes a prohibition on the compulsory education functions of a school. Rather than looking at the statute in its proper context, including interpreting words like "promotion" and "program" by the company they keep, the court interpreted each word in isolation. Only then was it able to say the Section covers a "staggeringly broad" swath of conduct, including basketball teams and clubs. The

standard tools of statutory interpretation, however, reveal that the Section applies only to the mandatory, instructional functions of a school, not to extracurricular activities.

The court said it "must interpret the law this broadly." Not so. Precedent required the court to consider whether the statute was "readily subject to a narrowing construction." And it was.

IV. The preliminary-injunction factors weigh against an injunction. Plaintiffs' lack of likelihood of success on the merits dooms their motion. More, they can show no irreparable harm, because SF496 does not provide for enforcement against students. That Plaintiffs waited nearly six months—while SF496 was enforceable—to bring this suit underscores their lack of harm. Indeed, to the extent irreparable harm exists, it is borne by the State, which faces injury each day it is enjoined from enforcing its duly enacted statutes. The balance of equities thus weighs against issuance of the extraordinary remedy of an injunction.

This Court should vacate the preliminary injunction.

## STANDARD OF REVIEW

This Court reviews a district court's decision to grant a preliminary injunction for abuse of discretion, reviewing legal conclusions de novo and

factual findings for clear error. *See Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022). Constitutional facts, however, are reviewed de novo. *See Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013).

A district court abuses its discretion when granting a preliminary injunction by disregarding "a relevant factor that should have been given significant weight." *Dixon v. City of St. Louis*, 950 F.3d 1052, 1055 (8th Cir. 2020).

## ARGUMENT

"A preliminary injunction is an extraordinary remedy," and the movant bears the burden to establish it is warranted. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). When determining whether to issue a preliminary injunction, district courts consider: "(1) the threat of irreparable harm to the movant; (2) the state of balance between that harm and the injury that granting the injunction will inflict on other parties; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Jet Midwest Int'l Co., v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020) (quotation marks omitted).

The probability of success on the merits is the most important factor, though no single factor is determinative. *See id.* And because Plaintiffs here seek to enjoin the enforcement of a duly enacted state statute, they must satisfy the more rigorous requirement that they are "*likely* to prevail on the merits." *Rounds*, 530 F.3d at 730 (emphasis added).

Plaintiffs do not meet that burden because they have neither established standing nor shown that SF496 likely violates any of their rights. The district court thus abused its discretion in issuing the preliminary injunction. This Court should vacate the injunction.

## I.    PLAINTIFFS LACK STANDING TO CHALLENGE SF496.

Before reaching the merits, federal courts must determine whether a plaintiff has Article III standing. *See Dept. of Educ. v. Brown*, 600 U.S. 551, 560 (2023). Standing requires a plaintiff establish three threshold elements: Plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). This inquiry is separate for each claim. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

The district court embraced an overly broad theory of standing to find that A.C., one Student Plaintiff, could challenge the Instruction Section, and that all Student Plaintiffs could challenge the Library Program.[1] Plaintiffs' harm is not tied to or caused by that Section's enforcement. So it cannot be redressed by an injunction against enforcement of that Section. App.497–498, R.Doc.65, at 19–20.

As for Plaintiffs' theory challenging the Library Program, the district court reasoned that because Plaintiffs were likely to prevail on the merits of their First Amendment right-to-receive-information violation, they had standing to bring that claim. App.496, R.Doc.65, at 18. But because the Library Program is government speech, it does not give rise to a cognizable First Amendment injury. So Plaintiffs lack standing to bring this claim too.

---

[1] State Defendants challenged Iowa Safe Schools's standing—both for itself and organizationally. App.257, R.Doc.53, at 13. Iowa Safe Schools lacked standing because it failed to allege that it suffered an injury-in-fact and failed to identify and show that its members suffered harm. The district court did not assess the organization's standing to challenge the Instruction Section or Library Program. App.499-500, R.Doc.65, at 21–22.

The other Student Plaintiffs are enrolled in grades to which the Instruction Section does not apply.

In sum, no Student Plaintiff faces any injury-in-fact that is traceable to the violations alleged and redressable by an injunction against enforcement of SF496. Plaintiffs lack standing to seek an injunction.

## A. Plaintiff A.C. Lacks Standing To Challenge Instruction Section.

No part or subsection of SF496 contemplates enforcement by any party—or non-party—against any student. The district court found A.C. had standing to challenge the Instruction Section because laws other than SF496 could be used to discipline A.C. if A.C. was disruptive in class. App.499–500, R.Doc.65, at 21–22. Those conclusions misunderstand how injunctions operate and misapply the overbreadth doctrine and statutory-interpretation principles.

Before this Court is a facial injunction invalidating every application of the Instruction Section. An as-applied challenge is not before the Court today. But if it were, A.C. has not alleged that A.C. plans to engage in any conduct that will violate SF496—or any other law that might lead to A.C.'s discipline. Thus, there is no potential harm to A.C. at all from SF496.

**1. A.C.'s alleged harms are not traceable to the Instruction Section and are not redressed by an injunction against that Section's enforcement.**

A.C. cannot show that the alleged harms are traceable to SF496's enforcement nor that the harms are redressed by the injunction. Traceability and redressability are issues that "often travel together," because unless a plaintiff's claimed injury is caused by the alleged violative conduct, it is unlikely that a favorable decision enjoining said conduct would redress the claimed injury. *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). A.C.'s theory of harm fails to overcome this hurdle, yet the district court neglected to consider this issue.

Federal courts cannot enjoin and erase statutes; an injunction runs against a defendant, enjoining a defendant from acting to enforce a statute. *See Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020) ("[F]ederal courts have no authority to erase a duly enacted law from the statute books."). Plaintiffs here must tie their alleged harm to *enforcement* of SF496.

SF496 is enforced against school districts and employees—not students. *See* SF496 §§ 2 (Iowa Code § 256.11(9)(a), (14); § 279.78(4)). An injunction against enforcing SF496 leaves Student Plaintiffs in the same position as if they had no injunction—at no time can SF496 be enforced against Student Plaintiffs.

Indeed, much of A.C.'s allegations of harm are tied to the Instruction Section's "message," not its enforcement. *See*, *e.g.*, App.209, 211–212, R.Doc.2-10, ¶¶ 10, 14. But even the district court recognized such "subjective apprehensions" do not give rise to standing. App.497, R.Doc.65, at 19. A.C. alleges that she fears the "consequences for herself" if she "simply expresses who she is" and is "honest and open about her identity." App.211–212, R.Doc.2-10, ¶¶ 14, 15. No part of the statute is enforced against A.C. to prohibit her from taking these actions.

The district court still found that A.C. had standing because "although Senate File 496 does not mention penalties against students, students nonetheless remain subject to generally applicable disciplinary policies and procedures." App.499, R.Doc.65, at 21. Invoking a creative daisy chain of hypotheticals, the court reasoned that if A.C. were to "express herself in the classroom," it could disrupt the classroom; then "if

the disruption was pervasive enough, this could lead to a verbal admonishment, trip to the principal's office, or some other form of discipline." *Id.*

But an injunction against any Defendants to prevent them from enforcing SF496 does not affect a school's ability to enforce these other disciplinary policies and procedures. And no Student Plaintiff requests an injunction against general school disciplinary policies and procedures. Those policies and procedures remain in full effect even as the preliminary injunction is in place.

The district court relied on *Parents Defending Education v. Linn Mar Community School District* to support its attenuated causal chain: "potential discipline on the basis of speech is sufficient to establish standing." App.499, R.Doc.65, at 21 (citing *Parents Defending Educ. v. Linn Mar Comm. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023)). But the policy at issue in *Parents Defending* expressly applied to students—it explained that a *student* who violates the policy "shall be disciplined by appropriate measures." 83 F.4th at 666. Compare that to SF496, no part of which applies to students. Any "potential discipline" that A.C. would face for "expressing herself" is too attenuated to be "fairly traceable" to SF496.

App.497, R.Doc.65, at 19 ("Nothing in Senate File 496 prohibits them from expressing themselves at school in the same manner they would have before the law was enacted."). And to the extent A.C. alleges "chill" or "self-censoring," those allegations fail to establish Article III injury. *Cf.* App.40–41, 44–45, 50, R.Doc.1, ¶¶ 125, 137, 155.

Indeed, even if this Court agreed that the collateral effects of enforcing other policies or statutes could give standing to challenge the Instruction Section, State Defendants are the wrong defendants. *See Arc of Iowa v. Reynolds*, 2024 WL 799579, at *2 (8th Cir. Feb. 27, 2024). "Plaintiffs here have not shown that either the Governor" or other State Defendants "have attempted to enforce the law in a manner that has directly affected" Plaintiffs. *Id.*

## 2. A.C.'s alleged harms are not constitutionally cognizable.

Plaintiffs fail to allege an injury-in-fact caused by the Instruction Section. To establish an injury-in-fact, a plaintiff must allege an "invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Missouri v. Biden*, 52 F.4th 362, 368 (8th Cir. 2022), (quotation marks omitted). To succeed on a pre-enforcement First Amendment challenge,

plaintiffs must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Parents Defending*, 83 F.4th at 666. Threatened enforcement must be more than speculative or even just possible; it must be "sufficiently imminent." *Id.*; *see Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 410 (2013) ("[H]ighly attenuated chain of possibilities" do "not satisfy the requirement that threatened injury must be certainly impending.").

Policies forcing self-censorship can create an injury-in-fact, but the fear leading to self-censorship must be based on more than mere allegations of a plaintiff's "subjective" announcing of a chill. *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011). "The relevant inquiry is whether a party's decision to chill his speech in light of the challenged statute was objectively reasonable." *Id.* (quotation marks omitted). "Reasonable chill" means a plaintiff's desired speech is "arguably proscribed" by the challenged statute. *Parents Defending*, 83 F.4th at 667. In short, a plaintiff must show that the challenged law arguably forbids the chilled speech and that exercising the chilled speech may have real consequences. That is missing here.

1. The district court erred by reasoning that A.C. had standing because of the threat of school disciplinary procedures and A.C.'s related decision to self-censor. App.499, R.Doc.65, at 21. A.C. does not sufficiently allege either a credible threat of prosecution or an objectively reasonable chill. The thrust of the "chilling effect" facing A.C. is that she "conceals herself," App.167, R.Doc.2-5, ¶ 10, because she fears the "consequences for herself" via school disciplinary policies if she "simply expresses who she is" and is "honest and open about her identity." App.211–212, R.Doc.2-10, ¶¶ 14, 15.

But no one has threatened enforcement against A.C. or other students for such conduct. Indeed, A.C. continues to use A.C.'s gender-affirming pronouns in school and dress in a way that expresses A.C.'s gender identity rather than biological sex. Yet A.C. does not allege that any school discipline has been imposed or threatened on her or others similarly situated, despite the Instruction Section having been enforceable for the entirety of the Fall 2023 semester. *Compare* R. Docs. 2-10, 2-13, *with 281 Care Comm.*, 638 F.3d at 629–630.

*281 Care Committee* is illustrative because there the alleged self-censorship had roots in complaints filed against plaintiffs in the past. 638

F.3d at 630 ("The reasonableness of plaintiffs' fear is also underscored by the fact that, in the past, plaintiffs' speech has triggered threats and the filing of one complaint."). And that was not the only potential font of discipline for plaintiffs. *See id.* ("This complaint—and the other complaints threatened—give plaintiffs grounds to reasonably fear that, unless they modify their speech, they will be subject to the hassle and expense of administrative proceedings" and thus "contribute to the objective reasonableness of alleged chill."). There are no allegations in this complaint that anyone—much less State Defendants—will seek to discipline A.C. And if A.C.'s fear is that she will engage in conduct that already violates other rules or laws, then the fact she is doing so because of her beliefs do not authorize otherwise bad or illegal behavior. *Cf. Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071, 1081 (8th Cir. 2024) (affirming Iowa law increasing penalties for assumed First Amendment-protected activity while trespassing).

There is no "credible threat" of enforcement against A.C. because her alleged protected speech is not proscribed by anything in the Instruction Section. After all, SF496 is enforced against school districts

and employees, not against students.[2] Nothing in the Section prohibits A.C. or other students from "taking pride" in who they are, "being honest and open about" their identities, "wearing clothing that could identify" their gender identity or sexual orientation, or expressly sharing their gender identity or sexual orientation with others, including teachers or staff. App.122, R.Doc.2-1, at 9.

Put differently, none of the asserted chilled activities are "arguably proscribed" by SF496, and therefore a decision to self-censor is not objectively reasonable. *See Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 793 (8th Cir. 2004). The district court thus erred in concluding that A.C. had standing to challenge the Instruction Section because of possible school discipline.

2. The district court determined that A.C. sufficiently alleged injury-in-fact because her school district thought GSAs violated the prohibition of "promotion" under the Instruction Section, so it closed the GSA, thereby inhibiting A.C.'s right to expressive association. App.499–

---

[2] Any "chilled speech" theory of harm based on A.C.'s fear that teachers would be disciplined for supporting her, App.210, R.Doc.2-10, ¶ 12, would belong to the injured party who faces threat of enforcement under that theory—*i.e.*, the teacher. There is no vicarious standing here.

500, R.Doc.65, at 21–22; *see also* App.209, R.Doc.2-10, ¶ 11. But that is wrong. A.C.'s, the school district's, and the court's over-reading of the Instruction Section is flawed in a way that leads to dramatic over-coverage. *See infra* 62–65. Read in context, the Section does not prohibit GSAs.

A.C. does not allege an injury-in-fact that gives her standing to challenge the Instruction Section. Nor can she satisfy Article III's traceability and redressability for this claim. Because the district court reasoned that only A.C. had standing to challenge the Instruction Section, this Court should vacate the preliminary injunction against enforcement of the Instruction Section on account of A.C.'s lack of standing.

**B.** **Plaintiffs Lack Standing To Challenge The Library Program Because Curation Of The Library Constitutes Government Speech.**

The district court said all Student Plaintiffs had standing to challenge the Library Program because that section limits the books Plaintiffs would otherwise have access to in their school libraries. App.496, R.Doc.65, at 18. But library-shelf book curation is government speech that is not subject to the First Amendment. *See infra* Part II.

Indeed, the at-best nonbinding "right to receive information in a school setting" is circumscribed. *See C.K-W by and through T.K. v. Wentzville R-IV Sch. Dist.*, 619 F.Supp.3d. 906, 917 (E.D. Mo. 2022) (citing *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 871 (1982)). And *Pico*'s plurality opinion does not apply here. *See infra* Section II.A.4.

Plaintiffs' alleged harm stemming from this government speech does not give rise to a constitutionally cognizable injury-in-fact. No one says public schools *must* buy books for their libraries. That is because the State speaks when it curates the books it wants—or does not want—to place on school library shelves. Students cannot force the State to speak how the State does not want to speak, which means students cannot force the State to place students' preferred books on the school library shelf. The Constitution does not give students editorial discretion over their school's library inventory. That discretion sits squarely with the State.

Even if the Library Program's enforcement does cause the harm alleged here, that harm is neither traceable to nor redressable by State Defendants. An injunction against enforcement of SF496 does not affect the State's editorial discretion when it comes to school libraries.

## II.  THE LIBRARY PROGRAM FITS WITHIN THE FIRST AMENDMENT.

Student Plaintiffs are not likely to succeed on the merits of their First Amendment claims against the Library Program. The district court explained that the Library Program violates Student Plaintiffs' First Amendment right to receive information while relying on cases predating the Supreme Court's elaboration on the government-speech doctrine. But that doctrine instructs that government compilation and curation of third-party speech in a public-school library is government speech and thus not subject to Free Speech Clause limitations.

Even so, the Library Program withstands First Amendment scrutiny, and *Pico* and *Pratt*, because it is a viewpoint-neutral restriction reasonably furthering the State's legitimate interest in educating Iowa's youth without risk of exposure to inappropriate materials, and it does not set out to achieve that goal in a religious, ideological, partisan, or political manner.

### A. When The State Speaks Through Curating Books In Public-School Libraries, Its Speech Is Not Subject To The First Amendment.

The First Amendment cannot be used to compel the State to speak, nor can it compel the State to speak in a particular way. That is because

the "Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009). "[W]hen the State is the speaker," as it is when it "determines the content of the education it provides," then "it may make content-based choices." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995). "This freedom includes choosing not to speak and speaking through the removal of speech that the government disapproves." *Mech v. Sch. Bd. of Palm Beach Cnty., Fla.*, 806 F.3d 1070, 1074 (11th Cir. 2015) (cleaned up). The government-speech doctrine protects the government's everyday functioning.

Though a "recently minted" doctrine, it is an important one. *Summum*, 555 U.S. at 481 (2009) (Ginsburg, J., concurring) (citing *Johanns v. Livestock Mktg. Assn.*, 544 U.S. 550 (2005)); *Rust v. Sullivan*, 500 U.S. 173 (1991)).

### 1.    What is government speech?

When the State acts in a manner to express its ideas, that is government speech. "The government may produce films and publications. It may run museums, libraries, television and radio

stations, primary and secondary schools, and universities. In all such activities, the government engages in the type of viewpoint discrimination that would be unconstitutional if it were acting as a regulator of private speech." *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 29 (D.C. Cir. 2005). Curating library books in public-funded school libraries is government speech.

Consider some illustrative principles highlighting the degree to which the State may speak without violating the First Amendment. When the government exercises editorial discretion, be it in a newspaper or on a public broadcast, the government speaks by facilitating some viewpoints over others. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) ("Much like a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school prescribing its curriculum, a broadcaster by its nature will facilitate the expression of some viewpoints instead of others."). When the government makes "esthetic judgments" selecting art that are "inherently content-based," and sometimes arbitrary, the government speaks. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 585–586

(1998). So too for selecting certain statues or monuments for public parks over others. *Summum*, 555 U.S. at 472.

Those principles remain true even when the government's editorial decisions involve the "compilation of the speech of third parties," because curating private third parties' speech is a communicative act expressing a message on behalf of the government that is still the government's expressive activity. *Forbes*, 523 U.S. at 673–675.

This goes for a public library too. *See United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 206 (2003) (plurality op.). By curating the public library's content, the State expresses its view about what materials have the "requisite and appropriate quality." *Id.* Libraries do not provide the resources they do as a forum for private speakers; they do so "to facilitate research, learning, and recreational pursuits by furnishing materials of requisite and appropriate quality." *Id.*; *see Gittens*, 414 F.3d at 28 ("[T]he government speaks through its selection of which books to put on the shelves and which books to exclude."); *see also Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) (the government speaks when it "compil[es]" the "speech of third parties" in a public library). To achieve their "traditional mission," public libraries must have

the discretion to make content and viewpoint-based decisions. *Am. Libr. Ass'n*, 539 U.S. at 204–206.

The State's authority to speak is at a zenith in public schools. When the State "determines the content of the education it provides," it speaks. *Rosenberger*, 515 U.S. at 833; *see Ward v. Polite*, 667 F.3d 727, 732 (6th Cir. 2012) ("Foremost among a school's speech is its selection and implementation of a curriculum—the lessons students need to understand and the best way to impart those lessons—and public schools have broad discretion in making these choices."); *Chiras v. Miller*, 432 F.3d 606, 611 (5th Cir. 2005).

## 2. Curating a public-*school* library's contents is government speech.

Though this Court has not yet determined whether the government's curation (selection and removal) of the books in school libraries amounts to government speech, the principles above reveal that the answer should be a resounding "yes."

Just as schools must have discretion to set the curriculum to achieve their educational goals, and just as public libraries must have discretion to curate their collections, so too must public-school libraries have similar discretion. Schools need flexibility to support the State's

educational mission by "providing materials that properly supplement the basic readings assigned through the standard curriculum." *Zykan v. Warsaw Cmty. Sch. Corp.*, 631 F.2d 1300, 1308 (7th Cir. 1980). The State-as-a-curator need not provide "universal coverage" for all books, and instead may express its view on which books have the "requisite and appropriate quality" to foster student education and overall development. *Am. Libr. Ass'n*, 539 U.S. at 204, 206; *see Forbes*, 523 U.S. at 673–675. This editorial discretion and compilation of third-party speech to curate a message in support of a traditionally governmental mission is the epitome of government speech.

The Eleventh Circuit distilled a few factors that show the Supreme Court's framework for determining when expressive activity is government speech. *See Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 71 (11th Cir. 2022); *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–214 (2015) (discussing factors). Although no single factor is "individually or jointly necessary," that court considers: (1) whether government controls the speech; (2) whether the type of speech has traditionally communicated government messages; and (3)

whether the public would reasonably believe the government endorses the speech. *Gundy*, 50 F.4th at 71, 77.

Those factors show that book curation in a public-school library is government speech. *First*, control over the components of the expressive activity, or "final approval authority" over which organizations would or would not be allowed to participate in the compiled message, reflects government speech. *Johanns*, 544 U.S. at 561. *See also*, *e.g.*, *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 64 (2006) (where the City was the parade organizer and excluded organizations from participating in the parade because it disagreed with their speech, the City's activity was inherently expressive and "government speech"); *Mech*, 806 F.3d at 1078 (control factor "strongly suggests that the banners are government speech" because school principals needed to approve every banner before they were placed on school fences). Here the State and school districts and local officials control which books are placed or left on school library shelves, showing effective government control. That factor supports finding government speech here.

*Second*, libraries have traditionally communicated third parties' written speech "to facilitate research, learning, and recreational pursuits

by furnishing materials of requisite and appropriate quality." *Am. Libr. Ass'n*, 539 U.S. at 206. That is even truer for school libraries. *See Pico*, 457 U.S. at 868 ("A school library, no less than any other public library, is a place dedicated to quiet, to knowledge, and to beauty." (quotation marks omitted)). That factor too leans toward finding government speech here.

*Third*, when the State adds (or removes) a book from school library shelves, the public would reasonably believe the government endorses (or disagrees with) the speech. After all, Plaintiffs assert that belief, alleging harm from the public perception the Library Program creates. Like the first two factors, this factor too says government speech.

### 3. The Library Program curates school-library inventory.

SF496's Library Program curates Iowa's school libraries and so is government speech not subject to the Free Speech clause. Educating "the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). In concert with that great responsibility, the Library Program sets the contours for school-library inventory, with an eye towards removing books based on the books'

"educational suitability" or if the books are "vulgar," two reasons a majority of justices in *Pico* recognized as proper reasons for book removal. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684 (1986) (although the Court was "sharply divided" in *Pico*, all justices agreed schools could remove "vulgar" books).

Public schools in Iowa are creations of the State and many of their expressive decisions, including what books to make available in the library, are government speech. The Library Program regulates that government speech. Under the Supreme Court's government-speech principles, the Library Program does not trigger the First Amendment's Free Speech Clause.

4. ***Pico*** **and** ***Pratt*** **are of no value here because those cases did not have the benefit of the Supreme Court's Government Speech Cases.**

The district court relied on *Pratt* and *Pico* to say—for the first time in Iowa—that Plaintiffs have a First Amendment "right to receive information." But neither case provides much, if any, value. The court should have instead applied the Supreme Court's government-speech doctrine.

1. *Pico* is a fractured decision with no precedential value. No opinion garnered five votes. Applying the Supreme Court's preferred *Marks* rule, the binding decision in *Pico* is Justice White's solo concurrence agreeing to remand because there was a material issue of fact that precluded summary judgment. *Pico*, 457 U.S. at 883 (White, J., concurring in the judgment); *see Marks v. United States*, 430 U.S. 188, 193 (1977) (necessary to determine the "position taken by those Members who concurred in the judgments on the narrowest grounds"); *see also C.K.-W*, 619 F.Supp.3d. at 913–14 (collecting cases finding Justice White's opinion in *Pico* controlling, applying the *Marks* rule).

Not only is *Pico*'s holding irrelevant here, there is not much guidance in *Pico*'s plurality on the issues presented here. Five justices rejected a "right to receive" under the First Amendment. *See Pico*, 457 U.S. at 878–880 (Blackmun, J., concurring in part and in the judgment); *id.* at 885 (Burger, C.J., dissenting) (four-justice dissent). Meanwhile only three justices explicitly agreed on such a right. *Id.* at 866–867 (plurality op.). In short, *Pico* does not do the work that Plaintiffs seek here. *See ACLU v. Miami-Dade*, 557 F.3d 1177, 1200 (11th Cir. 2009) (*Pico* lacks "precedential value" and "establishes no standard" on these issues).

2. To understand the import of such a fractured decision, one would naturally think to look to cases post-*Pico* and see how they treat the issues at play. While recognizing the post-*Pico* uncertainty, App.502, R.Doc.65, at 24 ("[I]t would be difficult to apply *Pico* without additional guidance."), the district court looked to a case *predating* that decision despite what came after. That was wrong.

To get to that result, the district court applied *Pratt v. Independent School District No. 831, Forest Lake, Minnesota*, 670 F.2d 771 (8th Cir. 1982), which issued months before *Pico*. This Court in *Pratt* recognized a First Amendment claim when a school removes a book "to suppress an ideological or religious viewpoint with which the local authorities disagreed." *Id.* at 776. This Court was concerned such decisions could impose a "'pall of orthodoxy' on classroom instruction" particularly eyeing religion and ideology. *Id.* To avoid violating students' right to receive information, a school "must establish that a substantial and reasonable governmental interest exists for interfering with the students' right to receive information." *Id.* at 777.

The district court felt bound by *Pratt* absent "clear guidance from a higher court that it is no longer good law." App.510, R.Doc.65, at 32.

Though the Supreme Court's government speech cases do not abrogate *Pratt* by name, they do so in function. *See*, *e.g.*, *C.K.-W.*, 619 F.Supp.3d at 914 n.4 ("The *Pratt* decision has not aged well in the forty years of First Amendment jurisprudence since its issuance") (citing cases applying the government-speech doctrine). Other circuits have recognized as much for their pre-government-speech-doctrine cases. *See*, *e.g.*, *Chiras*, 432 F.3d at 616–617 (noting how a case from 1989, which determined that removal of a textbook was subject to First Amendment scrutiny, "did not have the benefit of the Supreme Court's clarification of the government's authority over its own message"). This Court should too.

3. The district court attempted to justify its setting aside of the government-speech doctrine by distinguishing those cases on the ground that they dealt with "acquisition" of books, while this case and *Pico* and *Pratt* deal with removal. App.509–510, R.Doc.65, at 31–32.

There is no principled basis for such distinction. Just as acquisition and removal of statues and monuments in a public park both amount to government speech, so too does the acquisition and removal of library books in a school library. *See* Frederick Schauer, *Principles, Institutions, and the First Amendment*, 112 Harv. L. Rev. 84, 114 (1998) ("[I]t would

be a mistake as well to draw an abstract distinction between selection and de-selection" of books in libraries).

In *Summum*, the Supreme Court held that the government's selection of monuments for a public park, which took "into account such content-based factors as esthetics, history, and local culture," was government speech not restricted by the Free Speech Clause. 555 U.S. at 470–473. The "decision to accept certain privately donated monuments while rejecting respondent's" was "government speech," and the government was not required to "maintain viewpoint neutrality" in that decision. *Id.* at 479, 481.

Since *Summum*, the government-speech doctrine has been applied to removal of monuments or statutes from parks; there is no principled distinction between the analysis in *Summum* and these follow-on cases. *See*, *e.g.*, *Gardner v. Mutz*, 857 F.App'x 633 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 762 (2022) (plaintiffs' challenge of relocation of Confederate monuments failed because "[m]onuments in public parks, even when funded by private parties, constitute government speech"); *McMahon v. Fenves*, 946 F.3d 266 (5th Cir. 2020) (dismissing First Amendment claims because plaintiffs lacked standing to challenge removal of Confederate

statues); *Shreveport Chapter #237 of United Daughters of the Confederacy v. Caddo Par. Comm'n*, 331 F.Supp.3d 605 (W.D. La. 2018), *summarily aff'd*, 756 F.App'x 460 (5th Cir. 2019) (removing a Confederate monument from courthouse grounds "best viewed as a form of government speech" not subject to First Amendment); *Patterson v. Rawlings*, 287 F.Supp.3d 632, 636 (N.D. Tex. 2018) (same).

The same goes for removal of artwork and advertisements. *See*, *e.g.*, *McGriff v. City of Miami Beach*, 84 F.4th 1330, 1332, 1336 (11th Cir. 2023) ("City's removal of one piece of plaintiffs' artwork constituted government speech."); *Mech*, 806 F.3d at 1074–75 (school engaged in government speech when it removed banners advertising plaintiff's business from school fences).

And the same goes for removal of books from a public-school library. *See C.K.-W.*, 619 F.Supp.3d at 916–918. The district court's acquisition-removal distinction turns out to be a distinction without a difference.

\* \* \*

Had the district court applied the Supreme Court's government-speech doctrine cases—all post-dating *Pratt* and *Pico*—for the guidance it knew it needed, it would have understood that those cases provide the

applicable standard. So too had the district court looked at this Court's sister circuits' approach to *Pico* and cases involving government speech. The curation of books in a public school's library—whether acquiring or removing books—is government speech not subject to the First Amendment's Free Speech clause. Because Plaintiffs' First Amendment claims fail, there is no likelihood of success on the merits. This Court should vacate the injunction.

**B.    The Library Program Survives First Amendment Scrutiny.**

Even if this Court holds that State curation of public-school-library inventory is not government speech and is subject to the First Amendment, the Library Program survives because it is a reasonable, viewpoint-neutral restriction. SF496 restricts library inventory by removing books describing "sex acts" from school libraries. SF496 § 2 (Iowa Code § 256.11(9)(a)(1), (19)(a)(1). SF496 does this to further its legitimate pedagogical interest in excluding books based on their "educational suitability" and vulgarity. *Pico*, 457 U.S. at 871 (plurality op.).

The district court found the Library Program was viewpoint neutral. App.512–513, R.Doc.65, at 34–35. But it ultimately found the

Library Program was content-based and not justified by a "substantial and reasonable government interest," and thus failed to meet constitutional muster under *Pratt* and *Pico*. The court did not stop there; it then determined the law was overbroad, because the law allowed schools to remove books that did not violate an "obscenity-light" standard. App.508, 514–515, R.Doc.65, at 30, 36–37.

The district court should have applied standard forum analysis and determined that the Library Program furthers the State's legitimate interest in educating Iowa's youth without exposing them to age-inappropriate materials.

1.   **The Library Program is a reasonable and viewpoint-neutral restriction on any "right to receive information."**

Applying First Amendment forum analysis, a school library is a limited public forum, which, like a nonpublic forum, may be "limited to use by certain groups or dedicated solely to the discussion of certain subjects," and the State "may impose restrictions on speech that are reasonable and viewpoint-neutral." *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 334–335

(8th Cir. 2011) (nomenclature, whether "nonpublic forum" or "limited public forum," does not change the governing standard).

The district court recognized that a library is a limited public forum, App.510, R.Doc.65, at 32, but opted to apply *Pratt*'s standard, which said a school "must establish that a substantial and reasonable governmental interest exists for interfering with the students' right to receive information." 670 F.2d at 776–777. As the court saw it, the standard governing limited public forums "is similar—if not identical—to the [*Pratt*] standard." App.510, R.Doc.65, at 32. This Court should apply the limited-public-forum standard and determine whether SF496's restrictions are viewpoint-neutral—which the district court said they were—and reasonable.

The Library Program passes muster under this standard.

1. The State's restrictions on speech in a limited public forum must be "reasonable in light of the purpose served by the forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806–809 (1985). Though it "need not be the most reasonable or the only reasonable limitation." *Id.* at 808. "The reasonableness of a restriction on access is supported when substantial alternative channels remain open for the

restricted communication." *Victory Through Jesus*, 640 F.3d at 335 (quotation marks omitted).

The State has a legitimate interest in ensuring an education suitable to students' age and to the traditional mission in public education of "inculcat[ing] the habits and manner of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation." *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 724 (8th Cir. 1998) (quotation marks omitted). Indeed, this Court has said policing profanity in schools relates to these legitimate pedagogical concerns. *Id.*

Schools have broad discretion to ensure their students are "not exposed to material that may be inappropriate for their level of maturity." *Kuhlmeier*, 484 U.S. at 271. A school may restrict "student speech that is inconsistent with its basic educational mission" so long as doing so "reasonably relate[s] to legitimate pedagogical concerns." *Id.* at 270–273; *Ward*, 667 F.3d at 732.

The Supreme Court has said that the interest in protecting minors from age-inappropriate materials is "legitimate, and even compelling." *Am. Libr. Ass'n*, 539 U.S. at 215 (Kennedy, J., concurring); *see Reno v.*

*ACLU*, 521 U.S. 844, 869–870 (1997) ("compelling" interest); *Miller v. California*, 413 U.S. 15, 18 (1973) ("legitimate" interest); *see also Fraser*, 478 U.S. at 684 (noting that, although the *Pico* Court was "sharply divided," all justices agreed to allow schools to remove books that are "vulgar").

Here the State could reasonably conclude that removing all books from school library shelves that included "descriptions or visual depictions of a sex act"—which, for example, includes removing books with depictions of "penetration of the penis into the vagina or anus" but allows books with health-related materials—was more beneficial to students and their education than allowing haphazard access to such books across Iowa's school districts. The State enacted a policy ensuring uniformity for students—all while respecting that parents may choose to allow their students to read whatever books they would like. Viewed through the lens of the State's legitimate interest in providing a suitable, age-appropriate education to minors, SF496's Library Program is reasonable.

Under the proper analysis, the State was not required to do the least-restrictive or the most-reasonable option. *See Cornelius*, 473 U.S.

at 808. Students continue to have access to the removed books, if they so choose, by visiting non-school libraries or obtaining the book from family, friends, or a bookstore. Websites like Amazon often carry an even wider variety of books than may be accessible in many of Iowa's school libraries. The State's judgment in SF496 was instead to remove books only from school shelves.

The district court rejected the State's approach, reasoning that SF496 "simply forbids 'sex acts' for the sake of them being 'sex acts.'" App.513, R.Doc.65, at 35. This, according to the court, does not further a substantial and reasonable government interest. *Cf.*, *e.g.*, *Lacks*, 147 F.3d at 724. Looking again to *Pratt* for guidance (even though that case both preceded *Pico* and did not apply a forum analysis), the court determined this restriction instead "impos[ed] a pall of orthodoxy" in the classroom. App.511–513, R.Doc.65, at 33–35.

Had the district court wished to rely on this Court's precedents it would have fared better to rely on *Lacks*. *Lacks* held "the school board had a legitimate academic interest in prohibiting profanity." 147 F.3d at 724. Profanity, like vulgarity, must fit within "'society's countervailing interest in teaching students the boundaries of socially appropriate

behavior.'" *Id.* (quoting *Fraser*, 478 U.S. at 681). And so that school's "flat prohibition on profanity in the classroom is reasonably related to the legitimate pedagogical concern of promoting generally acceptable social standards." *Id.* So too for the State establishing rules to exclude from school libraries books that include "sex acts."

Indeed, the "First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message. Rarely will a nonpublic forum provide the only means of contact with a particular audience." *Cornelius*, 473 U.S. at 809 (citation omitted). The restriction on a speaker's message is less problematic in a nonpublic or limited public forum because "the speakers have access to alternative channels" to reach their audience. *Id.*

Removing books based on their educational un-suitability is the principle at the heart of the Library Program. That reasonable restriction on access to books does not preclude their availability elsewhere. Because SF496 is a reasonable and viewpoint-neutral restriction on any right to receive information, Plaintiffs' First Amendment claim is likely to fail and thus should not have provided a basis for an injunction.

2. Invoking a "right to receive information" is not a get-out-of-jail-free card when a plaintiff's claims fail under the First Amendment's forums analysis. Plaintiffs and the district court cited *Pico* as the origin of their claimed "right to receive information." App.123, R.Doc.2-1, at 10; App.501–503, R.Doc.65, at 23–25. But as should be clear by now, *Pico* stands for no such right. *See supra* 43–45. To the extent *Pico* weighed in on the availability of that right, five justices in that case *rejected* it. *Id.*

That right, if it exists at all, does not expand the universe of free speech. It is instead merely "reciprocal" and derivative of the speaker's right to speak. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976). As the Third Circuit explained, "the cases interpreting the First Amendment do not contemplate that some speech may be restricted as to the speaker but not to the listener." *Doe ex rel. Doe v. Governor of New Jersey*, 783 F.3d 150, 155 (3d Cir. 2015). In other words, a recipient's "right to receive" the protected speech matches a speaker's affirmative right to speak.

Because the Library Program either regulates government speech or imposes a reasonable, viewpoint neutral restriction on school library inventory, and therefore does not inhibit any speaker's right to speak, the

law does not implicate Plaintiffs' claimed "right to receive information." *See Penguin Random House, LLC v. Robbins*, (8th Cir. No. 24-1082).

### 2. Plaintiffs are not likely to succeed on their First Amendment overbreadth claim.

A law is overbroad under the First Amendment if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotation marks omitted). The overbreadth doctrine exists "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). Facial challenges to a law because of unconstitutional overbreadth are "strong medicine" and should be granted "with hesitation, and then only as a last resort." *New York v. Ferber*, 458 U.S. 747, 769 (1982) (quotation marks omitted).

In the public-school context, the hurdle is even higher. "[T]he overbreadth doctrine warrants a more hesitant application in [the public elementary and secondary schools] setting than in other contexts," *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 259 (3d Cir. 2002), because a much broader "plainly legitimate" sweep of speech can

be restricted in school than outside of school, *see Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969). There still must be a restriction on protected speech, even if the law at the same time properly restricts some unprotected activity, to justify an injunction.

The alleged protected First Amendment activity here, as Plaintiffs pleaded it, is the students' right to receive information. The next question then is what standard of scrutiny to apply.

Plaintiffs argued the Library Program was overbroad because it was not "limited to targeting 'pornography," and "swe[pt] up far more" than pornography. App.125–126, R.Doc.2-1, at 12–13. Plaintiffs do not cite a case, however, holding that the State's ability to remove inappropriate materials from educational and curricular materials for minors is limited to only pornography. And that makes sense because the standard is far more deferential than Plaintiffs let on.

The proper standard is deferential to the State's curricular and educational decisions. *See Kuhlmeier*, 484 U.S. at 273. The restrictions must be "reasonably related to legitimate pedagogical concerns." *Id.* As discussed above, the Library Program survives such scrutiny. *See supra* Section II.B.1.

A core objective of public education is the "inculcat[ion of] fundamental values necessary to the maintenance of a democratic political system." *Fraser*, 478 U.S. at 681. While educating students on these values, the State has a legitimate—even compelling—interest in protecting its youth from being exposed in school to material that is inappropriate for the school setting. *See Am. Libr. Ass'n*, 539 U.S. at 215 (Kennedy, J., concurring); *Bicknell v. Vergennes Union High Sch. Bd. of Directors*, 638 F.2d 438, 441 (2d Cir. 1980).

The district court did not find that the Library Program covered any books that do *not* include inappropriate materials. App.515–516, R.Doc.65, at 37–38. Every book removed from library shelves because of the Library Program included at least some material that was not "age-appropriate" under the law. *Id.* (all removed books have at least "a single sentence describing a sex act"). In that regard, the law is not overbroad at all. The court instead questioned the Program's restriction on books containing less quantity of obscene material than other books; that is, books that were not *rife* with explicit material, though still contained explicit material. *Id.*

The district court's downfall was its failure to be "more hesitant" in its application of the overbreadth doctrine to the public-school setting. *Sypniewski*, 307 F.3d at 259. The district court blazed new ground, recognizing a "sort of 'obscenity-light' standard" for laws restricting minors' access to books. App.508, R.Doc.65, at 30. That novel standard properly acknowledges the State can restrict content for minors even when it cannot for adults. But noticeably absent is any recognition of the special context of minors in a *public-school setting*.

Indeed, in creating this obscenity-light standard, the district court relied on four Supreme Court cases—none of which dealt with the special context of public school. They instead exclusively deal with public distribution of materials to minors. App.507–508, R.Doc.65, at 29–30. *See, e.g.*, *Ginsberg v. New York*, 390 U.S. 629 (1968) (challenging criminal statute prohibiting sale of obscene materials to minors); *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) (challenging ordinance prohibiting showing of films visible from a public place when those films contain nudity); *Reno*, 521 U.S. 844 (challenging law protecting minors from inappropriate material on the internet); *Brown v. Entertainment Merch.*

*Ass'n*, 564 U.S. 786 (2011) (challenging law restricting sale or rental of video games to minors). Those cases are not this case.

If this Court wishes to take up the district court's invitation to traverse new ground and set new standards, it should do so in the companion case where plaintiffs did not forfeit those issues. *See Penguin Random House, LLC v. Robbins*, (8th Cir. No. 24-1082). In *Penguin Random House*, the plaintiffs pressed the claim and novel standard that the district court analyzed. Plaintiffs here did not, nor did they lay out allegations under such a standard.

Plaintiffs instead alleged that unless a book contained "pornography," it should not be removed. App.125-126, R.Doc.2-1, at 12–13. Because Student Plaintiffs chose to litigate the case this way, their case is a poor vehicle to mark the metes and bounds of the obscenity (or "obscenity-light") standard applicable to viewpoint-neutral regulations of the educational environment. Especially when Plaintiffs fail to allege examples of books improperly restricted under that new legal standard, and thus fail to show the law is overbroad under that new legal standard.

## III. THE INSTRUCTION SECTION IS NOT VOID FOR VAGUENESS.

A statute "is unconstitutionally vague" under the Due Process clause "if it fails to provide adequate notice of the proscribed conduct and lends itself to arbitrary enforcement." *Parents Defending*, 83 F.4th at 668 (quotation marks omitted); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Such a law is "so uncertain that citizens forgo protected speech to steer clear of punishment." *Gerlich v. Leath*, 152 F.Supp.3d 1152, 1179 (S.D. Iowa 2016), *aff'd*, 861 F.3d 697 (8th Cir. 2017).

A statute is not unconstitutionally vague simply because there may be legitimate questions of statutory interpretation. *Farkas v. Miller*, 151 F.3d 900, 906 (8th Cir. 1998); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) ("perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.").

Rather, a court should first determine whether the statute is "readily subject to a narrowing construction." *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976) (quoting *Erznoznik*, 422 U.S. at 216); *see also* Iowa Code § 4.4(1) (statutes are presumed constitutional). If it is, then courts should apply it accordingly. Courts use standard tools of construction to give words their ordinary meaning when assessing a

vagueness challenge. *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 958 (8th Cir. 2019). "Context is king" when interpreting Iowa statutes. *Des Moines Flying Serv., Inc. v. Aerial Servs. Inc.*, 880 N.W.2d 212, 221 (Iowa 2016).

The Instruction Section says a "school district shall not provide any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation." SF496 § 16 (Iowa Code § 279.80). Context of this section and the law as a whole reveals that the Section applies only to mandatory portions of a school's function; it does not extend to extracurricular activities like the library or sports teams.

The statute's list of prohibited activities connotes a prohibition on the compulsory education functions of a school. When words grouped together share a "common denominator" to which the list may be reduced, the familiar interpretive canon—*noscitur a sociis*—may apply. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 195–198; *Des Moines Flying Serv.*, 880 N.W.2d at 222 (applying *noscitur a sociis*). That canon teaches that "a word is known by the company it keeps," *Dubin v. United States*, 599 U.S. 110, 124 (2023), and is "wisely

applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to" legislative acts, *United States v. Kidd*, 23 F.4th 781, 786 (8th Cir. 2022) (quotation marks omitted)). Applying this tool, when the Section is read as a whole, "instruction" and "program" and "promotion," alongside "curriculum" and "test" and "survey" and "questionnaire," indicate that the section applies to a school's mandatory, instructional functions—not to extracurricular activities like basketball teams or clubs.

The statute's title—"Sexual orientation and gender identity—prohibited instruction"—similarly shows a narrow construction is the correct one: the Instruction Section applies limitations on proper *instruction*, the compulsory functions of a school. *See Des Moines Flying Serv.*, 880 N.W.2d at 222 (applying title-and-headings canon); *see Reading Law* at 221–224.

SF496 read as a whole reinforces this conclusion. Other portions of SF496 incorporate or reference the Instruction Section (Iowa Code § 279.80) when discussing what is required of various compulsory instruction offerings, like in the discussion of the "kindergarten program," SF496 § 2 (Iowa Code § 256.11(2)), and of what "shall be

taught in grades one through six," SF496 § 2 (Iowa Code § 256.11(3)). Context thus clarifies that the Instruction Section governs compulsory instructional functions and does not place limits on extracurricular activities like basketball teams or GSAs.

Though Plaintiffs raised several claims challenging the Instruction Section, the district court addressed only the void-for-vagueness claim, reasoning that the statute covers so much conduct that it is susceptible to arbitrary enforcement. App.486–487, 519–522, R.Doc.65, at 8–9, 41–44.

But the district court's reading ignores important statutory context. The court looked at the words "program" and "promotion" in isolation, reasoning that they are so broad as to cover extracurricular activities like GSAs and basketball teams. *But see Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) (must interpret statutes as a whole and not construe words out of context or in isolation). The court reached its overexpansive reading in part because, as it sees it, the word "relating" broadens the terms "gender identity" and "sexual orientation" to include passing reference to one's sex such that "a teacher cannot instruct students to refer to the teach as 'Mr. ____' or 'Miss ____.'" App.487, 519–520,

R.Doc.65, at 9, 41–42. But a teacher telling the students his or her name is not part of the school's mandatory educational "program" or "instruction," just as the basketball team is not. And neither is it "promotion." As the ordinary tools of construction suggest, the Instruction Section restricts what can be part of a school's compulsory instruction.

Even if the court's interpretation were plausible, it should not have rendered the Section void for vagueness because the statute is "readily subject to a narrowing construction." *Young*, 427 U.S. at 60. The district court abused its discretion in jumping to a void-for-vagueness ruling. SF496's Instruction Section should not be enjoined.

## IV. REMAINING PRELIMINARY-INJUNCTION FACTORS CAUTION AGAINST ENJOINING SF496.

Plaintiffs' failure to show they are "likely to prevail on the merits" dooms their motion for a preliminary injunction. *Rounds*, 530 F.3d at 732. Even so, the remaining factors weigh against an injunction.

### A. Plaintiffs Can Show No Irreparable Harm.

"To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Powell v. Noble*,

798 F.3d 690, 702 (8th Cir. 2015) (quotation marks omitted). Plaintiffs fail across the board.

Because SF496 cannot be enforced against Plaintiffs, Plaintiffs face no irreparable harm. Plaintiffs do not allege any enforcement actions brought against districts or employees—or students—since the statute took effect. That is despite Plaintiffs continuing to express their gender identities and sexual orientations in school. Should Plaintiffs seek to access any books that have been removed from their school libraries, those books are available in non-school public libraries and in bookstores. Plaintiffs remain free to discuss those books with classmates at school during their free time, to encourage others to read them, and even to share their copy with friends.

This lack of imminent, irreparable harm helps explain why Plaintiffs waited so long to sue after the bill became law—delaying more than six months. Courts have found that similar delays in seeking a preliminary injunction "undermine a showing of irreparable harm and is a sufficient ground to deny a preliminary injunction." *Ng v. Board of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023) (quotation marks omitted); *see Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248

(11th Cir. 2016) (The "very idea of a *preliminary* injunction is premised on the need for speedy and urgent action," so a "delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm.").

It is no answer to explain away this six-month delay by pointing to the January 1, 2024, effective date for Library Program enforcement, because the Parental Notice and Instruction Sections could be enforced since June 1, 2023. And as Plaintiffs noted, even the Library Program was, in many schools, put into effect soon after SF496's enactment.

To the extent irreparable harm exists, it is borne by the State. Every day a State's duly enacted statutes are enjoined is an irreparable harm. *See Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) (recognizing that whenever "a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury") (quotation marks omitted)); *Texas Democratic Party v. Abbott*, 961 F.3d 389, 411 (5th Cir. 2020).

Plaintiffs' lack of irreparable harm is enough to vacate the injunction. Even if this Court is divided on likelihood of success, if it

clarifies the applicable standard and remands for further consideration it should also vacate the injunction.

## B. The Balance Of Equities And The Public Interest Do Not Favor Enjoining SF496.

SF496 seeks to avoid exposing minors to age-inappropriate materials in schools. An injunction risks students' irreversible exposure to inappropriate materials. The balance of this harm compared to forcing students to obtain certain books from home or a public library instead of their school library weighs against an injunction.

An injunction goes against the public interest for two key reasons. *First*, a "preliminary injunction is an extraordinary remedy." *Watkins*, 346 F.3d at 844. Even truer when plaintiffs seek to "thwart a State's presumptively reasonable democratic process." *Rounds*, 530 F.3d at 733.

*Second*, an injunction against enforcement of SF496 destabilizes the status quo. Because of Plaintiffs' six-month delay in seeking an injunction, State Defendants simply seek to preserve the status quo—the law has been in place, and largely enforceable, for many months. It should remain in force during the pendency of this litigation.

## CONCLUSION

For these reasons, this Court should vacate the preliminary injunction.

March 8, 2024                    Respectfully submitted,

                                 /s/ *Eric Wessan*
BRENNA BIRD                      ERIC WESSAN
Attorney General of Iowa         *Solicitor General*

                                 /s/ *Patrick C. Valencia*
                                 PATRICK C. VALENCIA
                                 *Deputy Solicitor General*

                                 Hoover State Office Building
                                 1305 East Walnut Street
                                 Des Moines, Iowa 50319
                                 (515) 823-9117 / (515) 281-5191
                                 (515) 281-4209 (fax)
                                 eric.wessan@ag.iowa.gov
                                 patrick.valencia@ag.iowa.gov

                                 *Counsel for State Defendants-
                                 Appellants*

## CERTIFICATE OF COMPLIANCE

Under Fed. R. App.P. 32(g) and Local R. 25A, I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App.P. 32(a)(7)(B) because it contains 12,999 words, excluding those parts exempted by Fed. R. App.P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App.P. 32(a)(5) and Fed. R. App.P. 32(a)(6) because the brief has been prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft Office 365.

3. This brief complies with the electronic filing requirements of Local R. 25A because the text of the electronic brief is identical to the text of the paper copies and because the electronic version of this brief has been scanned for viruses and no viruses were detected.

March 8, 2024

/s/ *Eric Wessan*
ERIC WESSAN
*Solicitor General*

*Counsel for State Defendants-Appellants*

# CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on March 8, 2024. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

March 8, 2024

/s/ *Eric Wessan*
ERIC WESSAN
*Solicitor General*

*Counsel for State Defendants-Appellants*