No. 24-1075

# In the United States Court of Appeals for the Eighth Circuit

GLBT YOUTH IN IOWA SCHOOLS TASK FORCE,
d/b/a IOWA SAFE SCHOOLS, *et al.*,

*Plaintiffs-Appellees*,

v.

KIM REYNOLDS, in her official capacity as
Governor of the State of Iowa, *et al.*,

*Defendants-Appellants*,

JULIE MITCHELL, in their official capacities as BOARD
MEMBERS OF THE URBANDALE COMMUNITY SCHOOL
DISTRICT, *et al.*,

*Defendants.*

Appeal from the United States District Court for the Southern District of Iowa
No. 4:23-cv-00474-SHL, Honorable Stephen H. Locher, District Judge

## BRIEF FOR PLAINTIFFS-APPELLEES

Thomas D. Story
AMERICAN CIVIL LIBERTIES UNION
 OF IOWA FOUNDATION
505 Fifth Avenue, Suite 808
Des Moines, IA 50309
(515) 243-3988

Camilla B. Taylor
LAMBDA LEGAL DEFENSE AND
 EDUCATION FUND, INC.
65 East Wacker Drive, Suite 2000
Chicago, IL 60601
(312) 663-4413

Laura J. Edelstein
JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
ledelstein@jenner.com

*Counsel for Plaintiffs-Appellees*
(Additional counsel listed on signature block)

# SUMMARY OF THE CASE AND STATEMENT ON ORAL ARGUMENT

Defendants-Appellants ("Iowa" or the "State") passed Iowa Senate File 496 ("SF496" or "the law") to limit discourse and expression in schools about gender identity and sexual orientation. SF496 bans books on these topics from school libraries and prevents students and teachers from discussing or even providing resources on these topics in schools in grades K-6.

Plaintiffs-Appellees are students ("Student Plaintiffs") and an organization with members that serves students ("ISS") (collectively, "Plaintiffs"), all of whom have been harmed by SF496. The district court enjoined the State from enforcing SF496's mandate that books describing or depicting sex acts be removed from school libraries ("Book Ban") or its prohibition on school programs, discourse, and material related to gender identity and sexual orientation ("Don't Say Gay/Trans Provision") on First Amendment, overbreadth, and vagueness grounds.

This case presents constitutional issues of public importance and warrants oral argument. Plaintiffs understand this case will be consolidated with Case No. 24-1082 for oral argument before the same panel. Plaintiffs in this case request 30 minutes to present their arguments.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule

26.1A, Plaintiff-Appellee GLBT Youth in Iowa Schools Task Force d/b/a Iowa Safe

Schools states that it has no parent corporation and that no publicly held corporation

owns more than ten percent of its stock.

Dated April 10, 2024.                    Respectfully submitted,

                                         /s/ *Laura J. Edelstein*
                                         Laura J. Edelstein
                                         JENNER & BLOCK LLP
                                         455 Market Street, Suite 2100
                                         San Francisco, CA 94105
                                         (628) 267-6800
                                         ledelstein@jenner.com

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND STATEMENT ON ORAL ARGUMENT ......... i

CORPORATE DISCLOSURE STATEMENT ......................................... ii

TABLE OF AUTHORITIES................................................................ vi

STATEMENT OF ISSUES ................................................................1

INTRODUCTION ...........................................................................3

STATEMENT OF THE CASE............................................................4

    A.    SF496's Background. ............................................................4

    B.    SF496's Book Ban and Don't Say Gay/Trans Provision. ....................5

    C.    Student Plaintiffs' Background and Harms Imposed by SF496. ..........7

        1.    Students Lose Access to Books Pulled from Libraries...............7

        2.    SF496 Has Chilled Student Speech and Expressive Association Related to Gender Identity and Sexual Orientation. ...................8

    D.    The District Court's Preliminary Injunction. .......................................10

SUMMARY OF ARGUMENT............................................................11

STANDARD OF REVIEW ...............................................................12

ARGUMENT ..................................................................................13

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT SF496'S BOOK BAN VIOLATES THEIR FIRST AMENDMENT RIGHTS...............................................................................13

    A.    The District Court Correctly Applied *Pico* and *Pratt*. ........................15

    B.    The Book Ban Is an Unconstitutional Content-Based Restriction. ........................................................................19

    C.    The Book Ban Also Is an Unconstitutional Viewpoint-Based Restriction. ........................................................................23

D.    The Book Ban Is Not Government Speech Exempt from the First Amendment. ..................................................................25

        1.    Historically, School Libraries and Library Books Have Not Been a Vehicle of Government Speech....................................27

        2.    No Reasonable Person Perceives the Content of School Library Books as the State's Speech.....................................................29

        3.    The State Does Not Control or Shape the Speech in School Library Books. ..........................................................................30

II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT SF496'S BOOK BAN IS UNCONSTITUTIONALLY OVERBROAD. .....33

III.    PLAINTIFF A.C. IS LIKELY TO SUCCEED ON HER CLAIM THAT SF496'S DON'T SAY GAY/TRANS PROVISION IS UNCONSTITUTIONAL................................................................................36

    A.    The Don't Say Gay/Trans Provision Is Impermissibly Vague and Lends Itself to Arbitrary and Discriminatory Application. ..........36

    B.    The Don't Say Gay/Trans Provision Is Unconstitutionally Overbroad...........................................................................................41

    C.    The Don't Say Gay/Trans Provision Impermissibly Chills Student Speech. ...................................................................................42

IV.    PLAINTIFFS HAVE BEEN HARMED BY SF496 AND HAVE STANDING. ...............................................................................................44

    A.    A.C. Has Standing to Challenge the Don't Say Gay/Trans Provision........................................................................................45

        1.    The Don't Say Gay/Trans Provision Resulted in the Closure of A.C.'s GSA. ...........................................................................45

        2.    A.C.'s Speech Is Reasonably Chilled by the Don't Say Gay/Trans Provision.................................................................46

    B.    All Student Plaintiffs Have Standing to Challenge the Book Ban.................................................................................................51

  C. ISS Has Standing to Challenge the Book Ban and the Don't Say Gay/Trans Provision. ...........................................................52

V. PLAINTIFFS ESTABLISHED AN IMMINENT THREAT OF IRREPARABLE HARM. ...............................................................54

VI. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH IN STUDENT PLAINTIFFS' FAVOR. ..........................................55

CONCLUSION .......................................................................................56

# TABLE OF AUTHORITIES

## CASES

*281 Care Committee v. Arneson*,
  638 F.3d 621 (8th Cir. 2011) .................................................................2, 47, 49

*281 Care Committee v. Arneson*,
  766 F.3d 774 (8th Cir. 2014) ................................................................43

*ACLU of Florida, Inc. v. Miami-Dade County School Board*,
  557 F.3d 1177 (11th Cir. 2009) ............................................................34

*Arc of Iowa v. Reynolds*,
  94 F.4th 707 (8th Cir. 2024) ................................................................51

*Arkansas Educational Television Commission v. Forbes*,
  523 U.S. 666 (1998) ................................................................26

*Board of Education, Island Trees Union Free School District No. 26 v.*
  *Pico*, 457 U.S. 853 (1982) .....................................................1, 14, 18, 20, 23, 27

*Book People, Inc. v. Wong*,
  91 F.4th 318 (5th Cir. 2024) ................................................................31

*Bose Corp. v. Consumers Union of United States, Inc.*,
  466 U.S. 485 (1984) ................................................................12

*C.K.-W. ex rel. T.K. v. Wentzville R-IV School District*,
  619 F. Supp. 3d 906 (E.D. Mo. 2022) ...........................................17, 34

*Campbell v. St. Tammany Parish School Board*,
  64 F.3d 184 (5th Cir. 1995) ................................................................19, 20

*Castaneda v. Pickard*,
  648 F.2d 989 (5th Cir. 1981) .........................................................50-51

*Chiras v. Miller*,
  432 F.3d 606 (5th Cir. 2005) ................................................................17

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2013) ................................................................49

*Counts v. Cedarville School District,*
  295 F. Supp. 2d 996 (W.D. Ark. 2003) ........................................................14, 19

*D.M. ex rel. Bao Xiong v. Minnesota State High School League,*
  917 F.3d 994 (8th Cir. 2019)...................................................................2, 55

*Dataphase Systems, Inc. v. C L Systems, Inc.,*
  640 F.2d 109 (8th Cir. 1981) ................................................................. 13

*Duffie v. City of Lincoln,*
  834 F.3d 877 (8th Cir. 2016) ................................................................. 52

*Duffner v. City of St. Peters,*
  930 F.3d 973 (8th Cir. 2019)................................................................. 52

*Erznoznik v. City of Jacksonville,*
  422 U.S. 205 (1975)................................................................................. 13

*FCC v. Fox Television Stations, Inc.,*
  567 U.S. 239 (2012)..............................................................................1, 37

*Farkas v. Miller,*
  151 F.3d 900 (8th Cir. 1998) ..................................................................36

*Fayetteville Public Library v. Crawford County,*
  No. 23-05086, 2023 WL 4845636 (W.D. Ark. July 29, 2023) ...........................27

*González v. Douglas,*
  269 F. Supp. 3d 948 (D. Ariz. 2017)....................................................19

*Good News Club v. Milford Central School,*
  533 U.S. 98 (2001)....................................................................................23

*Griswold v. Connecticut,*
  381 U.S. 479 (1965).................................................................................15

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982).................................................................................52

*Hunt v. Washington State Apple Advertising Commission,*
  432 U.S. 333 (1977)..............................................................................2, 54

*International Association of Firefighters of St. Louis v. City of Ferguson*, 283 F.3d 969 (8th Cir. 2002).........................................2, 50

*Legal Services Corp. v. Velazquez*,
531 U.S. 533 (2001)................................................................26

*Little v. Llano County*,
No. 22-cv-424, 2023 WL 2731089 (W.D. Tex. Mar. 30, 2023) ........................55

*Matal v. Tam*, 582 U.S. 218 (2017)........................................25, 26, 28, 29

*McKinney ex rel. NLRB v. Southern Bakeries, LLC*,
786 F.3d 1119 (8th Cir. 2015) ..............................................12

*McNaught v. Nolen*,
76 F.4th 764 (8th Cir. 2023)....................................44, 45

*Miller v. California*,
413 U.S. 15 (1973)................................................................28

*MPAY Inc. v. Erie Custom Computer Applications, Inc.*,
970 F.3d 1010 (8th Cir. 2020)..............................................13

*New York Civil Liberties Union v. New York City Transit Authority*,
684 F.3d 286 (2d Cir. 2012)................................................53

*Otero v. Mesa County Valley School District No. 51*,
568 F.2d 1312 (10th Cir. 1977).........................................51

*Parents Defending Education v. Linn Mar Community School District*,
83 F.4th 658 (8th Cir. 2023).......................1, 36, 37, 46, 47

*PEN American Center, Inc. v. Escambia County School Board*,
No. 23-10385, — F. Supp. 3d —, 2024 WL 133213 (N.D. Fla. Jan. 12, 2024)..............................................27, 29

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009)................................................26, 31, 32

*Powell v. Noble*,
798 F.3d 690 (8th Cir. 2015)............................... 2, 54-55

*Pratt v. Independent School District No. 831*,
670 F.2d 771 (8th Cir. 1982) ..............................................1, 14, 16, 20

*Price v. Denison Independent School District*,
694 F.2d 334 (5th Cir. 1982) ...............................................50

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)...............................................................19, 20

*Republican Party of Minnesota, Third Congressional District v.
Klobuchar*, 381 F.3d 785 (8th Cir. 2004)...........................48

*Richland/Wilkin Joint Powers Authority v. United States Army Corps
of Engineers*, 826 F.3d 1030 (8th Cir. 2016) ......................13

*Rodgers v. Bryant*,
942 F.3d 451 (8th Cir. 2019) ...............................................13

*Rosenberger v. Rector & Visitors of University of Virginia*,
515 U.S. 819 (1995)...............................................20, 23, 24, 25, 31

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022)...............................................................1, 26, 29

*Snider v. City of Cape Girardeau*,
752 F.3d 1149 (8th Cir. 2014)...............................................42

*Stanley v. Georgia*, 394 U.S. 557 (1969) ...............................15

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard
College*, 600 U.S. 181 (2023) ..............................................54

*Tinker v. Des Moines Independent Community School District*,
393 U.S. 503 (1969)...............................................................13

*United Food & Commercial Workers International Union v. IBP, Inc.*,
857 F.2d 422 (8th Cir. 1988)................................................39, 40

*United States v. American Library Ass'n*,
539 U.S. 194 (2003)...............................................................32, 34

*United States v. Raiburn*,
20 F.4th 416 (8th Cir. 2021)................................................40

*United States v. Stevens,*
559 U.S. 460 (2010)................................................................1, 33, 42

*Village of Arlington Heights v. Metropolitan Housing Development*
*Corp.*, 429 U.S. 252 (1977) .................................................................53

*Virginia v. American Booksellers Ass'n,*
484 U.S. 383 (1988)................................................................................43

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.,*
576 U.S. 200 (2015)................................................................................26

**STATUTES**

Iowa Code § 216.2(10)........................................................................6, 37

Iowa Code § 216.2(14)........................................................................6, 37

Iowa Code § 256.11 .........................................................................2, 6, 51

Iowa Code § 256.11(2)............................................................................51

Iowa Code § 256.11(3)............................................................................51

Iowa Code § 256.11(3) (eff. July 1, 2021-June 30, 2023) .........................5

Iowa Code § 256.11(4) (eff. July 1, 2021-June 30, 2023) .........................5

Iowa Code § 256.11(5)(j)(1) (eff. July 1, 2021-June 30, 2023) ................5

Iowa Code § 256.11(9)............................................................................51

Iowa Code § 256.11(9)(a)(2)......................................................................6

Iowa Code § 256.11(9)(a)(3)......................................................................6

Iowa Code § 256.11(9)(b)...........................................................................5

Iowa Code § 256.11(10)..........................................................................51

Iowa Code § 256.11(19)(a)(1) .................................................................5, 6

Iowa Code § 256.11(19)(a)(2) .................................................................5, 6

Iowa Code § 279.50(10) (eff. July 1, 2021-June 30, 2023)......................28

Iowa Code § 279.50(10)(a) .................................................5, 21

Iowa Code § 279.80 .................................................................8

Iowa Code § 279.80(1).............................................................41

Iowa Code § 279.80(2)............................6, 37, 40, 41, 46, 48

Iowa Code § 280.6 ...................................................................6

Iowa Code § 599.1 .................................................................33

Iowa Code § 702.5 .................................................................33

Iowa Code § 702.17 .............................................................5, 6

Iowa Code § 709.4(1)(b).........................................................33

Iowa Code § 728.1(5)..........................................................4, 28

Iowa Code § 728.2 ..............................................................4, 56

Iowa Code § 728.3 ...................................................................4

Iowa Code § 728.7 .................................................................28

Iowa Admin. Code r. 281-12.2..............................................22

Iowa Admin. Code r. 281-12.3(12) .......................................21

Iowa Admin. Code r. 281-12.3(12)(b)(6)..............................29

**OTHER AUTHORITIES**

Samantha Hernandez & Chris Higgins, *After Federal Judge's Injunction On Iowa's Book Ban Law, Confusion and Concerns Linger*, Des Moines Reg. (Jan. 23, 2024), https://www.desmoinesregister.com/story/news/education/2024/01/23/iowa-book-ban-senate-file-496-despite-injunction-from-federal-judge-concerns-linger-des-moines/72085262007/ ............................................35

**STATEMENT OF ISSUES**

I.    Did the district court act within its discretion in determining that Student Plaintiffs demonstrated they are likely to succeed on their claim that SF496's Book Ban violates their First Amendment right to receive information in school libraries?

> **Cases:**    *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982)
>
> *Pratt v. Indep. Sch. Dist. No. 831*, 670 F.2d 771 (8th Cir. 1982)
>
> *Shurtleff v. City of Bos.*, 596 U.S. 243 (2022)

II.    Did the district court act within its discretion in determining that Student Plaintiffs demonstrated they are likely to succeed on their claim that SF496's Book Ban is unconstitutionally overbroad and violates their First Amendment free speech rights?

> **Cases**:    *United States v. Stevens*, 559 U.S. 460 (2010)

III.    Did the district court act within its discretion in determining that Student Plaintiff A.C. is likely to succeed on her claim that SF496's Don't Say Gay/Trans Provision is unconstitutionally vague?

> **Cases:**    *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023)
>
> *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)

IV.  Did the district court act within its discretion in determining that Student Plaintiffs have standing to bring their claims?

**Cases:**   *281 Care Comm. v. Arneson*, 638 F.3d 621 (8th Cir. 2011)

*Int'l Ass'n of Firefighters of St. Louis v. City of Ferguson*, 283 F.3d 969 (8th Cir. 2002)

*Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977)

**Statutes:**   Iowa Code § 256.11

V.  Did the district court act within its discretion in determining the Student Plaintiffs demonstrated a sufficient "threat of irreparable harm," including a violation of their rights to receive information and the chilling of speech and expressive association?

**Cases:**   *Powell v. Noble*, 798 F.3d 690 (8th Cir. 2015)

VI.  Did the district court act within its discretion in determining that both the balance of equities and public interest weigh in Plaintiffs' favor?

**Cases:**   *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994 (8th Cir. 2019)

# INTRODUCTION

Iowa students are entitled to express and receive diverse viewpoints at school. But the State—taking aim at already vulnerable LGBTQ+ students—seeks to silence them, erase from schools any recognition that LGBTQ+ people exist, and bully students, librarians, and teachers into quiet acquiescence.

SF496 prohibits "program[s]," "instruction," or any form of "promotion" related to "gender identity" or "sexual orientation" for K-6 students and bans material describing "sex acts" for K-12 students on the ground that these topics are never "age-appropriate." The State exempts from its bans certain religious texts that otherwise would clearly run afoul of the law's censorship, signaling to schools that its broad proscriptions on programs and promotion target LGBTQ+ identities and orientations. The State even requires outing students who use pronouns other than those associated with their sex assigned at birth to their parents or guardians, regardless of whether the child could face harm. Under SF496, schools and staff are punished for failure to comply with the content bans or forced outing requirements. Each provision of SF496 was deliberately designed to silence the voices of LGBTQ+ students and eliminate their access to resources and books that affirm who they are.

The law had the desired effect. Immediately after SF496 was enacted, Iowa schools removed books with LGBTQ+ themes from libraries, shuttered LGBTQ+

extracurricular clubs, and pulled pride flags down from classrooms. In response to this unwelcoming climate that SF496 instilled, students self-censored.

The district court recognized the Book Ban and Don't Say Gay/Trans Provision of SF496 for what they are—unconstitutional, unjustified, and imminent threats to a student's right to receive information and to their free speech and expressive association rights. This Court should affirm.

## STATEMENT OF THE CASE

### A. SF496's Background.

Prior to SF496, Iowa school libraries made a wide range of books and information available to students, including on gender identity and sexual orientation. *See* App.26-27, R.Doc.1, at 22-23. Teachers and students could discuss those topics, and students could find community in non-curricular expressive associations such as gender sexuality alliances ("GSAs") and speak to trusted school staff about their gender identity and sexual orientation without fear. Existing state laws ensured students were well protected from obscene material and material inappropriate for their age. *Id.*[1]

---

[1] *See also* Iowa Code § 728.1(5) (defining "[o]bscene material" in line with the Miller Test); *Id.* § 728.2 (criminalizing dissemination and exhibition of obscene material to minors), *id.* § 728.3 (criminalizing admitting minors to premises where obscene material is exhibited).

That all changed with the enactment of SF496. The law mandates a broad ban on any books and materials related to gender identity and sexual orientation in school libraries, and restricts discourse on these topics in K-6 spaces. SF496 was part of a wave of legislation targeting LGBTQ+ and specifically transgender youth. App.27-28, R.Doc.1, at 23-24; App.788-89, R.Doc.34-18, at 4-5. According to the State, the purpose of SF496 was to "restore sanity" to schools by silencing what the State considers an "extreme and extremely loud minority." *See* App.28, R.Doc.1, ¶ 91.

### B.     SF496's Book Ban and Don't Say Gay/Trans Provision.

On May 26, 2023, Iowa Governor Kim Reynolds signed into law SF496, redefining "age-appropriate" materials under Iowa's Educational Standards. Under SF496, the Educational Standards, which govern accreditation, now mandate that Iowa's K-12 schools provide an "age-appropriate" educational program "taught from an age-appropriate . . . approach." Iowa Code § 256.11, unnumbered paragraph, (9)(b).[2] Failure to conform to the definition of "age-appropriate" results in compliance hearings, disciplinary action, or potential loss of accreditation. Iowa

---

[2] Before SF496, the "age-appropriate" requirement applied only to health and sex-education classes. *See* Iowa Code § 256.11(3), (4), (5)(j)(1) (eff. July 1, 2021-June 30, 2023). The Educational Standards defined "age-appropriate" as "topics, messages, and teaching methods suitable to particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group." Iowa Code §§ 256.11(19)(a)(2), 279.50(10)(a). SF496 added two situational alterations to this original definition. Iowa Code §§ 256.11(19)(a)(1), 702.17.

Code § 256.11, unnumbered paragraph, (9)(a)(3). SF946 includes two core components that vastly expand the scope of the Educational Standards.

***First***, for grades K-12, SF496 excludes from the definition of "[a]ge-appropriate" "any material[s] with descriptions or visual depictions of a sex act" (the "All-Ages Ban"). Iowa Code §§ 256.11(19)(a)(1), 702.17.[3] Under the All-Ages Ban, material with descriptions or visual depictions of a sex act are never appropriate for K-12 students. The All-Ages Ban, however, has two carve-outs: (1) for the K-12 human growth and development curriculum, and (2) certain religious texts, despite their sexual content, which must be kept in school libraries. Iowa Code §§ 256.11(9)(a)(2), (19)(a)(2), 280.6. The All-Ages Ban expressly applies to K-12 library programs (the "Book Ban"). Iowa Code § 256.11(9)(a)(2).

***Second***, SF496 prohibits "any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation" in grades K-6 (the "Don't Say Gay/Trans Provision"). Iowa Code § 279.80(2). Under the Don't Say Gay/Trans Provision, programs and material related to "gender identity" or "sexual orientation" are never appropriate for grades K-6.[4] Consequently, although the All-Ages Ban supposedly exempts K-6 human

---

[3] The definition of "sex act" was taken from Iowa's criminal code.

[4] The definitions of "[g]ender identity" and "[s]exual orientation" were taken from Iowa's Civil Rights Act, Iowa Code § 216.2(10), (14).

growth and development curriculum, such instruction cannot mention gender identity or sexual orientation. As the district court concluded, on its face, SF496's prohibition on any "program" or "promotion" related to gender identity or sexual orientation extends to K-6 library programs and other noncurricular spaces. App.494, R.Doc.64, at 16.[5]

### C. Student Plaintiffs' Background and Harms Imposed by SF496.

#### 1. Students Lose Access to Books Pulled from Libraries.

In response to SF496, Iowa's school districts removed hundreds of books from classrooms and libraries. App.38, R.Doc.1, at 34; App.481, 506, R.Doc.65, at 3, 28; *see* App.782, R.Doc.34-17, at 3. School districts specifically targeted books with LGBTQ+ content for removal, leaving some school libraries and K-6 classrooms without any books acknowledging the existence of LGBTQ+ people or families. App.193, R.Doc.2-8, ¶ 22 (ISS Decl.); App.209-11, R.Doc.2-10, ¶¶ 10-13 (R. Carlson Decl.). In contrast, books depicting heterosexual and cisgender characters, families, and narratives remain untouched and available to all students. App.211-12, R.Doc.2-10, ¶ 14 (R. Carlson Decl.).

---

[5] At the preliminary injunction hearing, the State appeared to suggest that the Don't Say Gay/Trans Provision does not apply to library programs or classroom libraries. *See* App.456-57, R.Doc.62, at 46-47. However, the State walked back this suggestion, App.457-78, R.Doc.62, at 84-85, and the district court recognized it was "inconsistent with the plain language" of SF496. App.494, R.Doc.65, at 16.

Because of SF496, Student Plaintiffs have lost access to books they wish to read. App.38-41, R.Doc.1, at 34-37. LGBTQ+ students seeking stories with LGBTQ+ characters have received the message they are shameful and inappropriate in school settings. App.210-12, R.Doc.2-10, ¶¶ 13-14 (R. Carlson Decl.); App.164-66, R.Doc.2-5, ¶¶ 3-5 (P.C. Decl.); App.141, R.Doc.2-2, ¶ 11 (B.F. Decl.). Students preparing for college are disadvantaged, having lost access to treasured classics and modern works of critical acclaim still taught in other states. App.174-75, R.Doc.2-6, ¶¶ 11-12 (Doe Decl.); App.227-29, R.Doc.2-12, ¶ 10 (Newsom Decl.).

> 2.   SF496 Has Chilled Student Speech and Expressive Association Related to Gender Identity and Sexual Orientation.

SF496 has restricted the activities of GSAs, interfering with their ability to meet and promote inclusion on terms comparable to other extracurricular student clubs. App.193-95, R.Doc.2-8, ¶¶ 21-29 (ISS Decl.). Some GSAs have shuttered completely because school districts have prohibited them or teachers have declined to serve as sponsors for fear of being forced to "out" students to hostile parents or guardians. App.201, R.Doc.2-9, ¶ 4 (Smith Decl.); App.209, R.Doc.2-10, ¶ 11 (R. Carlson Decl.); App.193-95, R.Doc.2-8, ¶¶ 21-29 (ISS Decl.). GSAs in schools with students in sixth grade or younger have been hit especially hard; schools have closed GSAs to comply with the Don't Say Gay/Trans Provision's ban on "any program" or "promotion ... relating to gender identity or sexual orientation" for those students. Iowa Code § 279.80; *see* App.209, R.Doc.2-10, ¶ 11 (R. Carlson Decl.). Some GSAs

have reported a decline in student engagement due to students' fears around SF496's forced outing requirement. App.173, R.Doc.2-6, ¶ 7 (Doe Decl.); App.151, R.Doc.2-3, ¶ 11 (P.B.-P. Decl.); App.194-95, R.Doc.2-8, ¶¶ 25-29 (ISS Decl.).

Student Plaintiffs have been closed off from forms of expression in which they used to engage. They have become more reluctant to be "out" about their identities at school (App.139, R.Doc.2-2, ¶ 6 (B.F. Decl.); App.149-50, R.Doc.2-3, ¶¶ 7-8 (P.B.-P. Decl.)); to wear clothing that reflects their identity or acknowledges they are LGBTQ+ (App.139-38, R.2-2, ¶ 7 (B.F. Decl.); App.149, R.Doc.2-3, ¶ 7 (P.B.-P. Decl.); App.158, R.Doc.2-4, ¶ 7 (B.F.S. Decl.)); to ask fellow students and teachers to refer to them using accurate names and pronouns (App.166, R.Doc.2-5, ¶ 7 (P.C. Decl.); App.151-52, R.Doc.2-3, ¶ 13 (P.B.-P. Decl.)); to engage in classroom discussion that reveals their identities or to mention LGBTQ+ issues generally (App.140, R.Doc.2-2, ¶¶ 8-9 (B.F. Decl.); App.173, R.Doc.2-6, ¶ 8 (Doe Decl.); App.179, R.Doc.2-7, ¶ 4 (T.S. Decl.)); to write essays or papers acknowledging their LGBTQ+ identities (App.149-50, R.Doc.2-3, ¶ 8 (P.B.-P. Decl.)); to engage in political advocacy concerning LGBTQ+ topics (App.151, R.Doc.2-3, ¶ 12 (P.B.-P. Decl.)); and to express themselves or pride in their identities in other ways. Other students, including ISS members, feel they have no choice but to remain in the closet. App.172-73, R.Doc.2-6, ¶¶ 6-7 (Doe Decl.); App.195, R.Doc.2-8, ¶ 28 (ISS Decl.).

**D.      The District Court's Preliminary Injunction.**

The district court enjoined SF496's Book Ban and Don't Say Gay/Trans Provision on First Amendment, overbreadth, and vagueness grounds on December 29, 2023. *See* App.480–524, R.Doc.65, at 1-46. The court rejected the State's primary arguments that the Book Ban and Don't Say Gay/Trans Provision are government speech not subject to the First Amendment and its promise that in enforcing SF496, it would read the provisions more narrowly than their text suggests.[6] App.509-511, 522, R.Doc.65, at 31-33, 44.[7]

The district court held Student Plaintiffs are likely to prevail on their claim that the Book Ban violates their First Amendment right to receive information in public libraries because SF496's "expansive definition of 'age-appropriate'" requires the wholesale removal of books from school libraries without any "'substantial and reasonable governmental interest' justifying" the "across-the-board

---

[6] The State asserted at the preliminary injunction hearing that under the Don't Say Gay/Trans Provision, "a fourth grade teacher" could not "have a book that has a gay character and share that book with students[,]" *see* App.457, R.Doc.62, at 84, but the teacher could acknowledge the concept of gender identity by asking students to refer to him as "mister," *see* App.459-60, R.Doc.62, at 86-87. The State thereby confirmed it interprets the Don't Say Gay/Trans Provision to prohibit references to sexual orientation or gender identity pertaining only to *LGBTQ+* identities, conceding it is a viewpoint-discriminatory prohibition.

[7] The district court did not address the merits of Plaintiffs' Equal Access Act and equal protection. App.523 n.8, R.Doc.65, at 45 n.8. Plaintiffs are pursuing those claims in the district court.

removal." App.511-13, R.Doc.65, at 33-35 (citation omitted).[8] The district court also held the Student Plaintiffs are likely to prevail on their First Amendment overbreadth challenge to the Book Ban because a "substantial number" of its applications are "unconstitutional" when "judged in relation to the statute's plainly legitimate sweep" in violation of Student Plaintiffs' First Amendment free speech rights. App.513-14, R.Doc.65, at 35-36. And the district court determined Student Plaintiff A.C. is likely to prevail on her claim that the Don't Say Gay/Trans Provision is void for vagueness in violation of her First Amendment right to expressive association. App.519-22, R.Doc.65, at 41-44.

## SUMMARY OF ARGUMENT

The Court should affirm the preliminary injunction. Plaintiffs are likely to succeed on their challenges to both provisions at issue. The Book Ban is a textbook example of a content- and viewpoint-based restriction in violation of the First Amendment. The State's attempt to extend the government-speech doctrine is the type of "dangerous misuse" of which the Supreme Court warned.

---

[8] Although the district court recognized that the All-Ages Ban also applies to curricular spaces (*see* App.504, R.Doc.65, at 26), the district court's order focused on the aspects of that Ban requiring removal of books from school libraries, *see, e.g.*, App.481, 483-86, 500-19, 523-24, R.Doc.65, at 3, 5-8, 22-41, 45-46. These other aspects are not before the Court.

The Book Ban also is unconstitutionally overbroad because SF496 "has a staggeringly broad scope." It allows for no consideration of a student's age or a book's political, artistic, literary, or scientific value.

The Don't Say Gay/Trans Provision is void for vagueness and chills student speech. It is not susceptible to any reasonable narrowing construction that would account for its broad application to all "program[s]" and "promotion."

Plaintiffs have standing to challenge SF496. The Don't Say Gay/Trans Provision has directly harmed at least one plaintiff. The Book Ban harms all Student Plaintiffs. And ISS has standing to challenge both provisions.

Finally, the record demonstrates the imminent threat Plaintiffs face due to SF496, and the balance of the equities and public interest weigh in their favor.

## STANDARD OF REVIEW

In reviewing a district court's grant of a preliminary injunction, this Court reviews the district court's "factual findings for clear error, its legal conclusions *de novo*," and the "ultimate decision" to grant a preliminary injunction for "abuse of discretion." *McKinney ex rel. NLRB v. S. Bakeries, LLC*, 786 F.3d 1119, 1122 (8th Cir. 2015) (citation omitted). In cases raising First Amendment issues, this Court may independently examine the whole record. *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984). Decisions on Article III standing are

legal conclusions reviewed *de novo*. *Rodgers v. Bryant*, 942 F.3d 451, 454-56 (8th Cir. 2019).

Plaintiffs seeking a preliminary injunction must establish four factors that: (1) they are likely to "succeed on the merits"; (2) they are likely to suffer "irreparable harm" absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in "the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). Although "'no single factor is determinative,' the probability of success factor is the most significant." *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020). Likelihood of success need be shown only on one of multiple claims. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016).

## ARGUMENT

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT SF496'S BOOK BAN VIOLATES THEIR FIRST AMENDMENT RIGHTS.

Students are "entitled to a significant measure of First Amendment protection." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975). Their right to receive information and rights to speech and expressive association do not disappear at "the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506, 511 (1969). Where, as here, a decision to remove books from school libraries is at issue, the government must "establish that a substantial and

reasonable governmental interest exists for interfering with the students' right to receive information." *Pratt v. Indep. Sch. Dist. No. 831*, 670 F.2d 771, 777 (8th Cir. 1982). Government officials may not remove books from school libraries "simply because they dislike the ideas contained in those books." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982). The State's decision to remove books from school libraries based on their content must be "justified by some exigency of the educational environment." *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1002 (W.D. Ark. 2003).

SF496's Book Ban directly implicates Plaintiffs' First Amendment right to receive information in school libraries. It has led to the removal of hundreds of books from school libraries, including classic works of fiction such as *Ulysses* by James Joyce, *As I Lay Dying* by William Faulkner, *Slaughterhouse Five* by Kurt Vonnegut, *Brave New World* by Aldous Huxley, and *Native Son* by Richard Wright. *See* App.485, R.Doc.65, at 7. Schools also have removed award-winning books by contemporary authors like Toni Morrison (*Beloved*, *Song of Solomon*, *The Bluest Eye*), John Green (*The Fault in Our Stars*, *Looking for Alaska*), and Maya Angelou (*I Know Why the Caged Bird Sings*), among many others. App.485-86, R.Doc.65, at 7-8. Many of these books are on high school Advanced Placement examinations. App.516, R.Doc.65, at 38. School districts also have targeted for removal books by LGBTQ+ authors and books with content of particular relevance to LGBTQ+

students, including LGBTQ+ characters, historical figures, or themes. App.141, R.Doc.2-2, ¶ 12 (B.F. Decl.); App.174, R.Doc.2-6, ¶ 11 (Doe Decl.); App.180, R.Doc.2-7, ¶ 7 (T.S. Decl.); App.193, R.Doc.2-8, ¶ 22 (ISS Decl.); App.201-02, R.Doc.2-9, ¶ 7 (R. Smith Decl.).

The district court correctly determined that Student Plaintiffs are likely to prevail on the merits of their First Amendment claim to receive information in school libraries. Plaintiffs are entitled to the First Amendment protections enshrined in the right to receive information acknowledged in *Pico* and espoused by this Court in *Pratt*. The State failed to show a substantial and reasonable governmental interest justifying its content-based Book Ban. *See* App. Br. 49-57. Its effort to place the Book Ban outside the scope of the First Amendment by claiming it is government speech lacks merit entirely. *See id.* at 35-49.

### A. The District Court Correctly Applied *Pico* and *Pratt*.

The constitutional right to receive information is well established and was articulated long before *Pratt* or *Pico*. Nearly six decades ago, the Supreme Court recognized "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge." *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965). Thus, the right of freedom of speech "includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read." *Id.*; *see also Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (the "right to receive

information and ideas, regardless of their social worth, is fundamental to our free society" (internal citations omitted)).

Contrary to the State's assertions, App. Br. 43, the district court did not craft a new constitutional right out of whole cloth. Rather it properly considered *Pico*'s and *Pratt*'s articulation of the long-recognized right to receive information, which remains good law, in evaluating Student Plaintiffs' claims.

In *Pratt*, this Court recognized that students have a right to receive information and held the state "must establish … a substantial and reasonable governmental interest" to infringe on this right without running afoul of the Constitution. *See* 670 F.2d at 777, 779. The State failed to meet its burden in *Pratt*, where a school board's underlying rationale for banning films was simply that some of its members "object[ed] to the films' religious and ideological content and wish[ed] to prevent the ideas contained in the material from being expressed in the school." *Id*. at 733. Like here, the state "used its official power to perform an act clearly indicating that the ideas contained in the [books] are unacceptable and should not be discussed or considered." *Id*. at 779. This Court held that such action was constitutionally "impermissible." *Id*.

*Pratt* is analogous and remains binding Eighth Circuit precedent that the district court must follow. As the district court correctly recognized, it could not ignore *Pratt* "without clear guidance from a higher court that it is no longer good

law." App.510, R.Doc.65, at 32. There has been no such "guidance." Instead, the State only offers a non-binding decision from the Eastern District of Missouri that suggests in a footnote that *Pratt* "has not aged well in the forty years of First Amendment jurisprudence since its issuance." App. Br. 46 (quoting *C.K.-W. ex rel. T.K. v. Wentzville R-IV Sch. Dist.*, 619 F. Supp. 3d 906, 914 n.4 (E.D. Mo. 2022)).[9] What is more, that Missouri district court nevertheless relied on *Pratt* and Justice Brennan's plurality opinion in *Pico* when considering the plaintiffs' claims—just as the district court did here. *See C.K.-W.*, 619 F. Supp. 3d at 914-15.

The State's argument that the Supreme Court's government-speech cases have functionally abrogated *Pratt* also fails for reasons explained in Section I.D. *infra*. The removal of books from a school library is not government speech.

The State's arguments about *Pico* fare no better. The district court did not treat *Pico* as "precedential," as the State implies. App. Br. 44-45. Instead, the district court acknowledged *Pico*'s "fractured" nature and noted where the justices diverged and where they agreed. *See* App.501, R.Doc.65, at 23. The court concluded that "[n]otwithstanding the splintered nature of the decision, *Pico* provides some guidance that remains applicable today." App.502, R.Doc.65, at 24. Specifically, the district court relied on *Pico* for the idea that "school boards can violate the

---

[9] The State also cites *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005), but that case does not mention *Pratt*. *See* App. Br. 46.

Constitution in *some* circumstances when making decisions about whether to remove books from the school library," *id.*, for example if a school board were to remove all books by a disfavored class of authors or advocating for a disfavored idea. In other instances, school boards can remove books without violating the First Amendment—for example, if a school board were to remove a specific book due to its high level of vulgarity. Underscoring the district court's measured approach, it recognized that "[b]eyond these areas of agreement, ... it would be difficult to apply *Pico* without additional guidance." *Id*.

The State's assertion that *Pico*'s plurality opinion offers little help simply because it was a plurality decision is incorrect. App. Br. 44. All nine justices agreed that school boards violate the Constitution in some circumstances when making decisions about whether to remove books from the school library because the "Constitution does not permit the official suppression of *ideas*." 457 U.S. at 871; *id.* at 907 (Rehnquist, J., dissenting). Three of the four dissenting justices also recognized that school boards may not exercise their discretion to "determine the content of their school libraries. … in a narrowly partisan or political manner." *Id*. The disagreement among the justices centered solely on the scope of the right to receive information and whether it encompassed *particular* books in school libraries. *See id*. at 888-89 (Burger, C.J., dissenting).

The district court recognized that *Pico* was a splintered decision, but it did not overstep in looking to *Pico* for guidance. It joined other courts that have relied on *Pico* and recognized the right to receive information in school settings. *See, e.g.*, *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189-90 (5th Cir. 1995) (looking to *Pico* for guidance and recognizing right to receive information in evaluating decision to remove book from school libraries); *Counts*, 295 F. Supp. 2d at 1004-05 (citing *Pico* and relying on students' right to receive information to reject restriction on access to *Harry Potter* series in school library); *González v. Douglas*, 269 F. Supp. 3d 948, 972-73 (D. Ariz. 2017) (relying on *Pico* in holding state law eliminating a school district's Mexican-American Studies program violated students' First Amendment right to receive information).

The State may believe that the students' right to receive information has not been violated. But as the district court correctly recognized, that right is well established and has been violated.

## B.     The Book Ban Is an Unconstitutional Content-Based Restriction.

SF496's Book Ban is "presumptively unconstitutional" because as the district court correctly observed, it is a content-based restriction: if a book contains the proscribed content, it is barred from school libraries. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); App.513, R.Doc.65, at 35. The law "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576

U.S. at 163. Even the State concedes the Book Ban is "inherently content-based." App. Br. 37 (citation omitted).

Content-based laws are justifiable in the context of school libraries only if the government proves a "substantial and reasonable governmental interest exists for interfering with the students' right to receive information." *Pratt*, 670 F.2d at 777; *cf. Campbell*, 64 F.3d at 189 (applying "greater scrutiny" to school board's decision to remove books than would apply in a decision involving school curriculum). That is because school libraries are intended to expose students to diverse ideas and viewpoints. They provide students the freedom to decide which books to read or check out and to pursue their own interests and areas of inquiry. School libraries are places for students "to test or expand upon ideas presented to [them], in or out of the classroom." *Pico*, 457 U.S. at 869 (citation omitted).

That a library may not be a "traditional" or "designated" public forum with respect to selection of content does not change the analysis, contrary to the State's suggestion. *See* App. Br. 50-51. Rather, as the district court properly recognized, school library content decisions are not "altogether free from First Amendment scrutiny." App.510, R.Doc.65, at 32. The State "may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' … nor may it discriminate against speech on the basis of viewpoint." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (citations omitted).

The State has failed to establish the existence of a substantial and reasonable interest—or even a legitimate pedagogical concern—for its Book Ban, which "requires the wholesale removal of every book containing a description or visual depiction of a 'sex act,' regardless of context," with no consideration of a book's political, artistic, literary, or scientific value. App.511-12, R.Doc.65, at 33-34. The State's ostensible interest in "protecting its youth from being exposed in school to material that is inappropriate for the school setting" does not pass constitutional muster. App. Br. 59.[10]

First, the State acknowledges that students should be protected from material that "may be inappropriate for their level of maturity." App. Br. 52 (citation omitted). But pre-existing standards already ensured as much. Not only were students protected from obscene material, but trained librarians and teachers made sure that library materials were appropriate for educational purposes. Iowa Admin. Code r. 281-12.3(12). Under those standards, both curricular and extracurricular materials were selected based on their suitability for "particular ages or age groups of children and adolescents, based on developing cognitive, emotional, and behavioral capacity typical for the age or age group." Iowa Code § 279.50(10)(a). School libraries, in addition to supporting the schools' overall curriculum, were still required to provide

---

[10] The State also argues courts must be deferential to "curricular" decisions. App. Br. 58. But it later admits school libraries are "extracurricular." *Id.* at 63.

"[a]ccess to a diverse and appropriate school library collection." Iowa Admin. Code r. 281-12.2. Thus, as the district court observed, schools applied an "obscenity-light" standard, taking into account students' ages and maturity levels.

SF496's Book Ban essentially deems all material with sex acts obscene for K-12 students without accounting for age or maturity. This standard—which at minimum applies to school libraries, but as the district court noted could apply to all Educational Standards, App.504, R.Doc. 65 at 26—not only restricts students from accessing books to which they previously had access in schools but treats books with sexual content as if they were obscene material unprotected under the First Amendment. The Book Ban, along with the Don't Say Gay/Trans Provision, has led school districts to remove more than 1,000 books from school libraries, specifically targeting LGBTQ+ content.

Second, as the district court also correctly found, the State failed to present any "evidence that student access to books depicting sex acts was creating any significant problems in the school setting, much less to the degree that would give rise to a 'substantial and reasonable governmental interest' justifying across-the-board removal." App.513, R.Doc.65, at 35. To the contrary, the State's declarants claim to have successfully used existing channels to remove books they found offensive or to exempt their children from having to read or discuss such books in

class. *See* App.279-80, R.Doc.53-1, ¶ 5 (Alexander Decl.); App.292, R.Doc.53-1, ¶ 19 (Collier Decl.); App.344-45, R.Doc.53-1, ¶¶ 7-8 (Briggs Decl.).

The Book Ban is a content-based restriction that does not serve any legitimate purpose, let alone a substantial and reasonable governmental interest. The district court did not abuse its discretion in ruling that the content-based Book Ban likely violates Plaintiffs' First Amendment right to receive information in school libraries.

### C. The Book Ban Also Is an Unconstitutional Viewpoint-Based Restriction.

The Book Ban not only discriminates based on content; it is "an egregious form" of content discrimination that constitutes "[v]iewpoint discrimination." *Rosenberger*, 515 U.S. at 829. Viewpoint discrimination is a clear violation of the First Amendment and not justifiable even in the school library context. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 99 (2001); *Pico*, 457 U.S. at 879-80 (Blackmun, J., concurring).

In *Rosenberger*, the Supreme Court held that even facially neutral policies can be viewpoint discriminatory. There, the University of Virginia had denied funding to a Christian student publication, asserting it had done so based on a content-based restriction outlined in the University Guidelines. Those Guidelines allowed funding of student groups related to student news, information, or opinion, but restricted funding for groups that "primarily promote[] or manifest[] a particular belie[f] in or about a deity or an ultimate reality." 515 U.S. at 825. In other words, all publications

the University determined demonstrated a belief in God would not receive funding. In excluding such content, the University Guidelines implied such content was not "related to the educational purpose of the University of Virginia." *Id*. at 824.

The *Rosenberger* Court held that denial of funding to the Christian student publication was "viewpoint discrimination." *Id*. at 832. The Court reasoned that to "discriminate against an entire class of viewpoints" is still viewpoint discrimination because the "exclusion of several views on [an issue] is just as offensive to the First Amendment as exclusion of only one." *Id*. at 831-32. Using topics of race and religion as examples, the Supreme Court found a policy silencing voices on those issues "skewed" the debate "in multiple ways." *Id*.

The Book Ban takes a more draconian approach than the University Guidelines in *Rosenberger*. It restricts content related to sex, sexual orientation, and gender identity. As in *Rosenberger*, students presumably are still allowed to talk about and circulate proscribed material outside of school. But unlike *Rosenberger*, where the University only withheld funding, the State goes further: it determines what discourse is germane by restricting student access to books describing or depicting sex, sexual orientation, and gender identity outside of health instruction or certain religious texts, such as the Bible, the Koran, and the Torah. In so doing, the State excludes "an entire class of viewpoints" on sex, sexual orientation, and gender in violation of Student Plaintiffs' right to receive information. *Rosenberger*, 515 U.S.

at 831-32. The Book Ban silences viewpoints on all three issues, which communicates the State-sanctioned message that LGBTQ+ people are unworthy of recognition and shameful "in multiple ways," and also ensures the State's view is the only view students receive in school. *Id*.

The district court's order enjoining the Book Ban may be affirmed on the basis that Plaintiffs are likely to succeed on their claim that the Book Ban constitutes impermissible viewpoint discrimination.

### D. The Book Ban Is Not Government Speech Exempt from the First Amendment.

The Supreme Court has warned that the "government-speech doctrine" is "susceptible to dangerous misuse." *Matal v. Tam*, 582 U.S. 218, 235 (2017). The Supreme Court also has cautioned that the doctrine could be used to silence or muffle "disfavored viewpoints" if applied to third-party speech "by simply affixing a government seal of approval." *Id.* Thus, the district court properly rejected the State's argument that the government-speech doctrine applies to school libraries and that restrictions on school library content are not subject to the First Amendment's constitutional protections. App.509-11, R.Doc.65, at 31-35; *see* App. Br. 33-49. Indeed, no court has accepted such an argument.

In determining whether the government-speech doctrine applies, the Supreme Court has looked to several types of evidence to evaluate whether the government intends to speak for itself or whether the government is regulating private

expression, including: (1) the history of the expression at issue and whether the state historically has communicated government messages through the medium; (2) whether the public reasonably would believe the government is speaking and has endorsed the speech; and (3) the extent to which the government has actively shaped or controlled the expression. *Shurtleff v. City of Bos.*, 596 U.S. 243, 252 (2022); *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 210-13 (2015); *Pleasant Grove City v. Summum*, 555 U.S. 460, 472-73 (2009).

In examining whether certain messages constitute government speech, the Supreme Court repeatedly has held that "the [government] does not itself speak or subsidize transmittal of a message it favors" when it "encourage[s] a diversity of views from private speakers." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542 (2001) (quoting *Rosenberger*, 515 U.S. at 834). Thus, although the "compilation of the speech of third parties" may constitute "communicative acts," *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998), the government does not purposefully express the message of that third-party speech just because it allows the speech in a specific forum. *See Matal*, 582 U.S. at 235-36 (third-party trademarks were not government speech just because the government approved the trademark); *Shurtleff*, 596 U.S. at 251-58 (third-party flags were not government speech just because the government allowed flags to fly on city hall flag poles).

Neither the selection nor the removal of books in school libraries constitutes government speech for three reasons. First, historically, school libraries have not communicated the State's messages. Second, no one reasonably perceives the contents of school library books as the State's speech. Third, the State does not control the contents of the books in school libraries; the authors do.

1.　　Historically, School Libraries and Library Books Have Not Been a Vehicle of Government Speech.

School libraries and library books have never had a history of conveying messages on behalf of the government. Instead, as noncurricular spaces, libraries long have been vehicles to expose students to a broad range of ideas and diverse viewpoints as expressed by authors. *Pico*, 457 U.S. at 868-69; *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, No. 23-10385, — F. Supp. 3d —, 2024 WL 133213, at *2 (N.D. Fla. Jan. 12, 2024); *Fayetteville Pub. Libr. v. Crawford Cnty.*, No. 23-05086, 2023 WL 4845636, at *3-5 (W.D. Ark. July 29, 2023). Even the State does not contend that library books were historically government speech. Instead, it admits that "libraries have traditionally communicated third parties' written speech." App. Br. 41-42.

There also is no history of the State removing books from school libraries in the wholesale fashion that SF496's Book Ban requires. The State would not seek to

ban these books if libraries had a history of keeping them off their shelves.[11] Rather, the district court found that "the evidence shows that the Iowa Legislature enacted Senate File 496 because local school boards would *not* remove books from school libraries." App.506, R.Doc.65, at 28.

Holding that placing or removing a book on a school library shelf "converts the [book] into government speech would constitute a huge and dangerous extension of the government-speech doctrine." *Matal*, 582 U.S. at 239. If the government's articulation of the government-speech doctrine is correct and applies to library books, a prohibition such as the Book Ban in SF496 could apply to public libraries because public librarians also review books for placement on shelves. It also could apply to public radio or television. And it would apply any time the government chooses not to "communicate[] third parties' . . . speech." App. Br. 41-42. The speech would not be limited to content related to sex, sexual orientation, and gender identity, but could also extend to race, religion, or politics.

Like the district court, this Court should reject the State's dangerous government speech argument.

---

[11] Prior to SF496, book removal was subject to the obscenity test articulated in *Miller v. California*, 413 U.S. 15 (1973), and codified in Iowa Code § 728.1(5). Librarians had discretion to determine whether books were appropriate based on their educational value. *See* prior version of Iowa Code § 279.50(10) (eff. July 1, 2021-June 30, 2023), and Iowa Code § 728.7. The *Miller* test is markedly different from the content-based ban here.

2. <u>No Reasonable Person Perceives the Content of School Library Books as the State's Speech.</u>

The State also cannot show that books selected for a school library are closely identified in the public mind with State speech or that the State has endorsed the books' messages. As the court in *PEN American Center* concluded, given that the "traditional purpose of a library is to provide information on a broad range of subjects and viewpoints," it is impossible to see "how any reasonable person would view the contents of the school library (or any library for that matter) as the government's endorsement of the views expressed in the books on the library's shelves." 2024 WL 133213, at *2. To conclude otherwise would mean that the State endorses *all* messages conveyed by *all* books in a school library, including books that may present contradictory views on religion, such as the Bible, the Koran, and the Torah, or divergent views on political economy, such as the *Wealth of Nations* and *Das Kapital*.

Iowa requires that school library programs "include a current and diverse collection of fiction and nonfiction materials." Iowa Admin. Code r. 281-12.3(12)(b)(6). If placing a book on the shelf of a school library makes the book government speech, the State "is babbling prodigiously and incoherently." *Matal*, 582 U.S. at 236. No one reasonably believes the State endorses the views expressed in the books on school library shelves.

3. <u>The State Does Not Control or Shape the Speech in School Library Books.</u>

In assessing whether the government has actively shaped or controlled the expression at issue such that it may be considered government speech, courts have been mindful to "prevent the government-speech doctrine from being used as a cover for censorship." *Shurtleff*, 596 U.S. at 263 (Alito, J. concurring). Although government control over speech may be an indicia of government speech, control is also "an essential element of censorship," and "[c]ensorship is not made constitutional by aggressive and direct application." *Id.* at 263-64. Thus, contrary to the State's suggestion, App. Br. 39-41, "neither 'control' nor 'final approval authority' can in itself distinguish government speech from censorship of private speech," *Shurtleff*, 596 U.S. at 264.

In *Shurtleff*, Justice Alito's concurrence illustrated how the government-speech doctrine could be used as a cover for censorship. He explained that under the British Licensing Act of 1737, Lord Chamberlain was given extensive "control over the nature and content" of covered performances. Playwright George Bernard Shaw, a leading critic of the Act, was denied permission to perform several plays. Justice Alito asks, "had the Lord Chamberlin approved these plays, would anyone seriously maintain that those plays were thereby transmuted into government's speech?" *Id.* The answer is No.

The same is true here. The State's selection of books for school libraries does not mean the State actively controls the books' messages such that they are transmuted into government speech. The authors of the books shape and control their messages. The State's removal of books also does not constitute government speech. It is censorship of private speech.

*Shurtleff* itself presents an example of the Supreme Court's rejection of the government-speech doctrine, where, as here, the government did not actively control the expressive content at issue. The Court held the City of Boston's flag-raising program did not constitute government speech because Boston did not actively control the flag raisings or shape the messages the flags projected. Rather, Boston encouraged a diversity of viewpoints. Other courts likewise have ruled the government-speech doctrine did not apply where the government did not actively control the content of the speech. *See, e.g.*, *Book People, Inc. v. Wong*, 91 F.4th 318, 337 (5th Cir. 2024) (education agency did not speak through booksellers' planned child-suitability book ratings despite ratings appearing on government website); *Rosenberger*, 515 U.S. at 833-34 (university did not speak through publications despite funding them and setting restrictions on funding).

The State's reliance on *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), is misplaced. There, the Court held that a city's "decision to accept certain privately donated monuments while rejecting" a monument proposed by a private group was

"best viewed as a form of government speech." *Id.* at 481. The Court's decision, however, rested on its conclusions that governments "have long used monuments to speak to the public," *id.* at 470, the city selected the monuments it wanted to display, and the city put them in a park owned and managed by the city and "linked to the [c]ity's identity." *Id* at 473-74. The monuments, therefore, were "meant to convey and have the effect of conveying a government message." *Id.* at 472.

Here, in contrast, school libraries historically have not been a medium of government speech, a reasonable person would not understand the content of school library books to be government speech, and the State does not control or shape the messages of library books.

*United States v. American Library Association*, 539 U.S. 194 (2003) ("*ALA*"), also does not support the State's government speech argument. As the district court recognized, *ALA* involved "[i]nternet filtering restrictions imposed by Congress on public libraries that receive federal assistance." App.510, R.Doc.65, at 32. The case "therefore addressed the limits on Congress's *spending* power, not limits on the regulation of private conduct." *Id. ALA* did not rule that the contents of public libraries constitute government speech; *ALA* does not even mention the government speech-doctrine. Further, unlike here, library patrons could access the restricted content. They only had to ask that filtering technology be turned off. *ALA*, 539 U.S. at 209. Under SF496, student access to prohibited material is restricted entirely.

No court has held that the selection or removal of books from a school library constitutes government speech, and for good reason. School libraries have been a vehicle and forum to expose students to a broad range of ideas and diverse viewpoints. The State does not speak through the books on the shelves or those that have been removed, and it does not adopt or endorse their messages. School library books express a diversity of viewpoints and ideas and communicate the speech of third parties—not the government.

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT SF496'S BOOK BAN IS UNCONSTITUTIONALLY OVERBROAD.

The district court correctly held that SF496 is unconstitutionally overbroad and infringes on Student Plaintiffs' free speech rights because "a substantial number of its applications are unconstitutional," *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted), in relation to the law's supposed aim of protecting Iowa's youth from "being exposed in school to material that is inappropriate for the school setting." App. Br. 59. *See* App.504, 513-16, R.Doc.65, at 26, 35-38. As the district court recognized, SF496 "has a staggeringly broad scope." App.514, R.Doc.65, at 36. Books that depict "sex acts" are considered "inappropriate" for all K-12 students, ranging from 5-year-old kindergarteners to 18-year-old adult high school seniors, regardless of the student's age or maturity,[12] and regardless of the book's political,

---

[12] In Iowa, a child reaches the age of majority at 18. Iowa Code § 599.1. The age of consent is 16 or sometimes earlier. *Id.* §§ 702.5, 709.4(1)(b).

artistic, literary, or scientific value.[13] Even "the dictionary and Iowa Code are likely prohibited book[s]." App.514, R.Doc.65, at 36.

The ban's breadth is unparalleled in existing case law. App.505-06, R.Doc.65, at 27-28.[14] The cases the State cites to try to justify its unconstitutional Book Ban, in contrast, involved a fraction of the books prohibited under the State's blanket ban. *See* App. Br. 44-45.[15] The district court aptly stated, "the Iowa Legislature has used a bulldozer where school boards in prior cases merely employed a scalpel." App.506, R.Doc.65, at 28.

The State points to *ALA* as involving a purportedly analogous broad ban. But *ALA*, a very different case from this one, illustrates the Book Ban's overbreadth. *ALA* involved internet pornography, access to which libraries cannot control except by placing a general, sometimes overbroad internet filter. The Supreme Court accounted for the overbreadth by ensuring adults could still access protected speech at the library upon request. 539 U.S. at 209.

---

[13] To the extent the Don't Say Gay/Trans Provision applies to K-6 school libraries, books regarding "gender identity" and "sexual orientation" also would be prohibited, compounding the law's overbreadth. *See* App.494, R.Doc.65, at 16.

[14] The State faults the district court for purportedly failing to identify a book removed from library shelves that did "*not* include inappropriate materials." App. Br. 59. The district court identified more than twenty books illustrating the law's overbreadth. App.515-16, R.Doc.65, at 37-38; *see also* App.506, R.Doc.65, at 28.

[15] *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1182-83 (11th Cir. 2009), involved one book. *C.K.-W.*, 619 F. Supp. 3d at 910, involved eight.

Here, laws predating SF496 already ensured school libraries were free of obscene material and librarians already regularly engaged in a book-by-book review as part of their everyday management and oversight of library collections to that end. Indeed, SF496's requirement that schools review and remove books in line with its Book Ban or face disciplinary action presupposes the ability to review each library book. SF496's restrictions thus need not be so broad and sweeping as to capture more than 1,000 books.[16]

The State does not claim that a school under preexisting procedures was unable to remove a book because it was obscene or did not serve any educational purpose. The State makes no argument that parents or other concerned individuals could not petition the removal of books on a case-by-case basis. Instead, SF496 restricts students from constitutionally protected materials and infringes on their free speech rights, including their ability to "engage in an 'open exchange of ideas' and to express beliefs that others might find disagreeable or offensive." App.504, R. Doc.65, at 26 (citations omitted).

---

[16] Recent reports indicate schools statewide have removed approximately 1,820 books, representing 615 unique titles. *See* Samantha Hernandez & Chris Higgins, *After Federal Judge's Injunction On Iowa's Book Ban Law, Confusion and Concerns Linger*, Des Moines Reg. (Jan. 23, 2024), https://www.desmoinesregister.com/story/news/education/2024/01/23/iowa-book-ban-senate-file-496-despite-injunction-from-federal-judge-concerns-linger-des-moines/72085262007/.

**III. PLAINTIFF A.C. IS LIKELY TO SUCCEED ON HER CLAIM THAT SF496'S DON'T SAY GAY/TRANS PROVISION IS UNCONSTITUTIONAL.**

SF496's Don't Say Gay/Trans Provision violates Student Plaintiff A.C.'s First Amendment rights whether interpreted as content-neutral or content/viewpoint-specific. Interpreted as content-neutral, the Don't Say Gay/Trans Provision is unconstitutionally vague and overboard. Interpreted as content/viewpoint-specific, the Don't Say Gay/Trans Provision impermissibly chills student speech and interferes with the right to expressive association.

**A. The Don't Say Gay/Trans Provision Is Impermissibly Vague and Lends Itself to Arbitrary and Discriminatory Application.**

The district court correctly determined that Student Plaintiff A.C. is likely to prevail on her claim that the Don't Say Gay/Trans Provision is void for vagueness under the due process clause of the Fourteenth Amendment and violates A.C.'s First Amendment rights. App.519-22, R.Doc.65, at 41-44.

A statute "is unconstitutionally vague if it fails to 'provide adequate notice of the proscribed conduct' and lends 'itself to arbitrary enforcement.'" *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 668 (8th Cir. 2023) (quoting *United States v. Barraza*, 576 F.3d 798, 806 (8th Cir. 2009)). In other words, "a statute must (1) be clear enough to provide a person of ordinary intelligence with notice of what conduct is prohibited, and (2) provide standards for those who enforce the prohibitions." *Farkas v. Miller*, 151 F.3d 900, 905 (8th Cir. 1998) (citation

omitted); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012). School policies "need not be as detailed as a criminal code that imposes criminal sanctions." *Parents Defending Educ.*, 83 F.4th at 668. But when a "school policy reaches speech protected by the First Amendment, the vagueness doctrine 'demands a greater degree of specificity than in other contexts.'" *Id.* (quoting *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308-09 (8th Cir. 1997)). Thus, although "a lesser standard of scrutiny is appropriate because of the public-school setting, a proportionately greater level of scrutiny is required because the regulation reaches the exercise of free speech." *Id.* (quoting *Stephenson*, 110 F.3d at 1308-09).

As the district court correctly ruled, no reasonable student or teacher can "know what will and will not lead to punishment" under the Don't Say Gay/Trans Provision. App.482, R.Doc.65, at 4. SF496 forbids any mention of sexual orientation or gender identity in K-6 grades, in or outside of the classroom. Specifically, the law prohibits school districts from providing "any program, curriculum, test, survey, questionnaire, promotion, or instruction relating to gender identity or sexual orientation to students in kindergarten through grade six." Iowa Code § 279.80(2). "Gender identity," in turn, is defined to include any gender-related identity, including cisgender, transgender, and nonbinary students, Iowa Code § 216.2(10), and "[s]exual orientation" is defined to include "actual or perceived heterosexuality, homosexuality, or bisexuality." Iowa Code § 216.2(14).

If the Don't Say Gay/Trans Provision is viewed as content-neutral, as the district court interpreted it, "the law forbids any programs, promotion, or instruction recognizing that anyone is male or female or in a relationship of any sort (gay or straight)." App.482, R.Doc.65, at 4. It also prohibits making available to students any books "that refer to any character's gender or sexual orientation; which is to say, virtually every book ever written." App.519, R.Doc.65, at 41. And it is "impermissible for teachers to identify historical figures or literary characters as being either male or female or use masculine or feminine pronouns to refer to them, as any such discussion would, again, amount to promotion or instruction that relates to the person's gender identity." App.487, R.Doc.65, at 9.

The district court thus properly determined that when interpreted as content-neutral, the incredible breadth of the Don't Say Gay/Trans Provision invites arbitrary and discriminatory enforcement. The law's breadth "means that a reasonable school district would not permit [A.C.] to join a GSA, thus interfering with her First Amendment rights to expressive association." App.522, R.Doc.65, at 44 (citing *Gay & Lesbian Students Ass'n v. Gohn*, 850 F.2d 361, 368 (8th Cir. 1988)). Indeed, SF496 caused school districts across Iowa to restrict the activities of GSAs. App.48, R.Doc.1, ¶ 148. A.C. could not attend a meeting of her GSA because her school district, Defendant Iowa City Community School District, prohibited GSAs for kindergarten through sixth grade. App.48-49, R.Doc.1, ¶ 151. Likewise, A.C. could

"say any number of things in the classroom about gender identity or sexual orientation that the State or a school district might decide is impermissible," subjecting A.C. and others to the "unfettered discretion" of the State in deciding whether to punish her speech as "disrupti[ve]." App.522, R.Doc.65, at 44.

The district court also properly rejected the State's argument that SF496 is susceptible to a narrowing construction, which the State again urges here. App. Br. 64-66. Federal courts generally lack authority to narrow state statutes where, as here, no narrow construction is "reasonable and readily apparent." *United Food & Com. Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422, 431 (8th Cir. 1988) (citation omitted).

The State argues the Don't Say Gay/Trans Provision applies only to "a school's compulsory instruction." App. Br. 66. But as the district court properly concluded, "this premise is inconsistent with the plain language of the law, which forbids a broader range of conduct, including 'programs' and 'promotion,' among other things." App.494, R.Doc.65, at 16. During oral argument, the district court also pointed out that the Legislature expressly used the term "compulsory" in another part of SF496 but did not use it in the Don't Say Gay/Trans Provision.[17] When a

_____

[17] "[Compulsory] appears one time in the entire bill, and it says, A child of compulsory attendance age who is identified as requiring special education, and then it talks about a special education program, so I don't see the word compulsory anywhere when it comes to what can or can't be done in the classroom relating to gender identity and sexual orientation. Instead, I see program, curriculum, test, survey, questionnaire, promotion, or instruction which seems really broad to me and

legislature uses certain language in one section but omits it in another, the omission is presumed to be intentional. *See United States v. Raiburn*, 20 F.4th 416, 423 (8th Cir. 2021).

To hold prohibited activities of "program" and "promotion" as restricted only to a school's compulsory instruction also would render such statutory language superfluous. The Court should decline the State's invitation. *See United Food & Com. Workers Int'l Union*, 857 F.2d at 431. If the Don't Say Gay/Trans Provision were limited only to compulsory instruction, presumably the State Legislature would not have included the words "promotion," "program," "survey," or "questionnaire."

Finally, the State fails to explain how its narrowing construction renders SF496 constitutional. It does not solve the problem presented by the phrase "*relating to* gender identity or sexual orientation," Iowa Code § 279.80(2) (emphasis added), which the district court recognized "must be 'interpreted expansively.'" App.520, R.Doc.65, at 42 (citation omitted). What does it mean to "relat[e] to"? Would a children's book on diversity of families "relat[e] to gender identity or sexual orientation"? What about a student essay about Harvey Milk or Pete Buttigieg? The State's proposed narrowing construction does not avoid the constitutional infirmities of the law.

---

goes well beyond what's compulsory or not compulsory." App.461-62, R.Doc.62, at 88-89.

**B.    The Don't Say Gay/Trans Provision Is Unconstitutionally Overbroad.**

SF496's Don't Say Gay/Trans Provision also is impermissibly overbroad as it punishes a substantial and disproportionate amount of protected First Amendment activity in relation to its purported legitimate sweep. Although the district court evaluated the Don't Say Gay/Trans Provision under vagueness principles only, the district court's analysis demonstrates equally why the provision is unconstitutionally overbroad.

As the district court found, the Don't Say Gay/Trans Provision is "staggeringly broad." App.519, R.Doc.65, at 41. The definitions of "[g]ender identity" and "[s]exual orientation," coupled with the prohibition on "program, curriculum, test, survey, questionnaire, promotion, or instruction *relating to* gender identity or sexual orientation," Iowa Code § 279.80(1), (2) (emphasis added), prohibits the mention of gender identity or sexual orientation in the classroom in any way. Books that refer to a character's gender or sexual orientation are not allowed. Math teachers cannot require students to take an exam that states, "Sally bought eight apples and ate three," and ask how many "she has left" because it is "a forbidden 'test . . . relating to gender identity.'" App.519-20, R.Doc.65, at 41-42. Teachers also must "be careful when talking to students about their families, as any such discussion might 'promote' or 'instruct' the idea that the student's parents have a sexual orientation (gay or straight), which is a forbidden topic." App.487, R.Doc.65, at 9.

Indeed, if interpreted as content-neutral, the Don't Say Gay/Trans Provision becomes a "don't say anything bill" (*id.*), and "every school district and elementary school teacher in the State has likely been violating it since the day the school year started." App.482, R.Doc.65, at 4.

The Don't Say Gay/Trans Provision is a "prohibition of alarming breadth." *Stevens*, 559 U.S. at 474. It covers such a "substantial amount of expressive activity," "[i]t is hard to imagine any scenario in which the elements of the statute would be met and yet the actions would constitute non-expressive conduct." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1158 (8th Cir. 2014). There is no legitimate purpose for such a sweeping provision.

### C. The Don't Say Gay/Trans Provision Impermissibly Chills Student Speech.

Although the district court concluded that the Don't Say Gay/Trans Provision is content-neutral, the State has made clear it views the provision as a content- and viewpoint-specific restriction. App.522, R.Doc.65, at 44. For example, in the State's view, SF496 permits a fourth-grade teacher to assign a book with a straight character, but not with a gay character. App.457, R.Doc.62, at 84; *see also* App.494, R.Doc.65, at 16. Likewise, according to the State, "it is fine if an assigned book's characters are 'boys' and 'girls' so long as this description matches their biological sex, but not if one of those characters is transgender." App.522, R.Doc.65, at 44.

As a content- and viewpoint-specific restriction, the Don't Say Gay/Trans Provision causes LGBTQ+ students to refrain from engaging in speech disclosing their sexual orientation and gender identity and expressing themselves consistent with their gender identity, objectively chilling protected expression. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988). It does not suppress comparable speech and expressive conduct by non-gay and non-transgender students.

For example, following the enactment of SF496, Plaintiff A.C., a fourth grader, "conceal[ed] herself instead of taking pride in who she is" at school (*see* App.167, R.Doc.2-5, ¶ 10 (P.C. Decl.); App.122, R.Doc.2-1, at 16), for fear "that being honest and open about her identity will get her, or any teachers or staff who might show support for her, into trouble," (App.212, R.Doc.2-10, ¶ 15 (R. Carlson Decl.)). A.C.'s fears were reasonable, especially given how school districts implemented the law when it was in force, "targeting LGBTQ+ books, rainbow images, and safe space stickers for removal and obstructing the ability of GSAs to meet[—]if they are allowed to meet at all." App.122, R.Doc.2-1, at 16. These actions communicated to students that "the law condemns any acknowledgement that LGBTQ+ people exist." *Id.* The vagueness of the Don't Say Gay/Trans Provision, coupled with its broad sweep and the prosect of discipline, incentivizes the suppression of speech. *See 281 Care Comm. v. Arneson*, 766 F.3d 774, 782 (8th Cir. 2014).

The State's interpretation of the Don't Say Gay/Trans Provision as forbidding only "programs, promotion, and instruction relating to transgender people and non-heteronormative relationships," App.522, R.Doc.65, at 44, also further compounds the arbitrary and discriminatory enforcement aspects of SF496. As the district court concluded, "the most likely enforcement" of the Don't Say Gay/Trans Provision will be against teachers and students who want to discuss same-sex relationships or gender identity. App.522, R.Doc.65, at 44.

Because the State has failed to show a legitimate government justification for the Don't Say Gay/Trans Provision, let alone a substantial and reasonable one, it violates the First Amendment.

## IV. PLAINTIFFS HAVE BEEN HARMED BY SF496 AND HAVE STANDING.

The district court correctly determined that Student Plaintiffs have standing to challenge the Don't Say Gay/Trans Provision and Book Ban.[18] To establish standing, Plaintiffs must show that they have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *McNaught v. Nolen*, 76 F.4th 764, 768-

---

[18] Plaintiffs did not cross-appeal the district court's ruling on their standing to challenge the forced outing provision and do not address that issue here. Plaintiffs, including ISS, maintain they have standing to challenge that provision. The district court did not address ISS's direct and representational standing. Plaintiffs are confident that further proceedings in the district court will support their position.

69 (8th Cir. 2023) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). An "injury in fact" is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 769 (quoting *Spokeo*, 578 U.S. at 339). Plaintiffs demonstrated: (1) A.C. has standing to challenge the Don't Say Gay/Trans Provision; (2) all Student Plaintiffs have standing to challenge the Book Ban Provision; and (3) ISS has standing to challenge both provisions.

### A. A.C. Has Standing to Challenge the Don't Say Gay/Trans Provision.

#### 1. The Don't Say Gay/Trans Provision Resulted in the Closure of A.C.'s GSA.

A.C. has standing to challenge the Don't Say Gay/Trans Provision because its enforcement directly resulted in the closure of her school's GSA. As discussed above, the Don't Say Gay/Trans Provision applies to extracurricular activities such as GSAs under any sensible reading. *See supra* Section III.A. What happened at A.C.'s school is an illustration of that reality.

Prior to SF496's enactment, A.C.'s school, Twain Elementary, had a GSA, "the aim of which was to build community among the LGBTQ+ students at the school." App.209, 206, R.Doc.2-10, ¶¶ 11, 4 (R. Carlson Decl.). A.C. attended several meetings last year when she was in third grade. App.209, R.Doc.2-10, ¶ 11 (R. Carlson Decl.). But "[t]his year, A.C.'s school district prohibited GSAs at the K-

6 level," and "A.C. and other LGBTQ+ students at her school" were not "able to attend" GSA meetings. *Id.* A.C.'s school also "removed all LGBTQ+ flag, posters, and similar items from classrooms and other spaces" because of the Don't Say Gay/Trans Provision. App.209, R.Doc.2-10, ¶ 10 (R. Carlson Decl.).

A.C. easily satisfies all three elements of standing. First, A.C. has suffered and continues to suffer a concrete injury-in-fact: she wishes to continue attending her school's GSA meetings but cannot do so because her school has prohibited the group from meeting. Second, that injury is traceable to enforcement of the Don't Say Gay/Trans Provision: the school closed the GSA to comply with the provision's ban on "program[s]" or "promotion[s]" relating to sexual orientation and gender identity. Iowa Code § 279.80(2). Third, the injury is redressable by the injunctive relief A.C. seeks: if A.C.'s school were no longer subject to the State's enforcement of the Don't Say Gay/Trans Provision, there is no reason to doubt it would return to its pre-SF496 practice of allowing the GSA to meet like any other student group.

<blockquote>2. <u>A.C.'s Speech Is Reasonably Chilled by the Don't Say Gay/Trans Provision.</u></blockquote>

A.C. also has standing to challenge the Don't Say Gay/Trans Provision because she reasonably self-censors expression in which she would otherwise engage. A plaintiff claiming "an abridgment of the right to free speech has standing to seek pre-enforcement review of a policy 'under circumstances that render the threatened enforcement sufficiently imminent.'" *Parents Defending Educ.*, 83 F.4th

at 666 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). Such a plaintiff "needs only to establish that [they] would like to engage in arguably protected speech, but that [they are] chilled from doing so by the existence of the statute. Self-censorship can itself institute injury in fact." *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011). The relevant inquiry is "whether a party's decision to chill [their] speech in light of the challenged statute was objectively reasonable, which is the case when [1] a plaintiff shows an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by the statute, and [2] there exists a credible threat of prosecution." *Id.* (cleaned up). A.C. satisfies both elements.

A.C. wishes "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by the statute," *id.* (citation omitted)—namely, expression of her transgender identity in the classroom, which the Don't Say Gay/Trans Provision proscribes. The State mischaracterizes the nature of that chilled expression. App. Br. 30. A.C. does not wish to *only* use pronouns or wear clothes that align with her identity as a girl. Rather, she wishes to engage in speech openly acknowledging her identity as a *transgender* girl and for her teachers to do the same where necessary to prevent bullying and to create a supportive classroom environment. *See* App.212, R.Doc.2-10, ¶ 15 (R. Carlson Decl.); App.235-36, R.Doc.2-13, ¶¶ 10-11 (U. Carlson Decl.). Such express discussion in a classroom

setting of the concept of gender identity and a particular student's *transgender* identity would directly implicate a "program, curriculum, . . . promotion, or instruction relating to gender identity." Iowa Code § 279.80(2).

This case therefore is distinguishable from *Republican Party of Minnesota, Third Congressional District v. Klobuchar*, 381 F.3d 785 (8th Cir. 2004), upon which the State relies. App. Br. 32. Unlike here, the challenged statute in *Klobuchar* had no bearing on the asserted chilled activities. Plaintiff, a local division of the state Republican Party, challenged the prosecution of one of its candidates for violating a law against knowingly making false campaign statements by stating that he was the "only Republican candidate" in a race he knew included another Republican candidate. 381 F.3d at 788. The Party argued that prosecution of the candidate chilled the Party "from engaging in party discussions regarding membership determinations and … its members from repeating those determinations." *Id.* at 792. The Court held the Party lacked standing because nothing in the statute's prohibition on knowingly making false statements bore on the Party's process of determining membership or on its members' repetitions of those determinations. *Id.* at 792-93.

Here, in contrast, if A.C. were to engage in an open dialogue with her classmates or teachers about her identity as a transgender girl, it would necessarily violate the law. A.C.'s acknowledgment of her transgender identity in class presentations or discussions would result in a "program, curriculum, … promotion,

or instruction relating to gender identity." Iowa Code § 279.80(2). The Don't Say Gay/Trans Provision directly chills A.C.'s expression.

A "credible threat of prosecution" also exists for two reasons. *281 Care Comm.*, 638 F.3d at 627 (citation omitted).

First, as the district court rightly recognized, A.C. reasonably fears that open discussion of her transgender identity in the classroom would result in disciplinary action against her or at best be pointless because her teacher would not be able to allow such discussion. *See* App.499, R.Doc.65, at 21. Such discipline or censorship is far from a remote possibility—it naturally follows that a teacher or administrator would prohibit a student from discussing in a curricular setting any topic that is legally prohibited. The threat that A.C. will face disciplinary action is real. It is not at all attenuated like in *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), where the Court held plaintiffs lacked standing to challenge a surveillance statute based on speculation that the Attorney General and Director of National Intelligence would intercept *all* their communications with foreign contacts, regardless of circumstances or subject matter. *See id.* at 411-12.

Second, A.C. reasonably believes that if she expressly acknowledged her transgender identity in a curricular setting and her teachers allowed her to do so, the State would enforce the Don't Say Gay/Trans Provision against those teachers. That action also would injure A.C.'s interests. Even where a statute's express enforcement

mechanism is against a person other than the plaintiff, the plaintiff still has standing to bring a pre-enforcement First Amendment challenge if her interests are so intertwined with those of the other person that enforcement against the other person is an injury to her own interests. In *International Association of Firefighters of St. Louis v. City of Ferguson*, 283 F.3d 969 (8th Cir. 2002), for example, plaintiff challenged a city charter provision prohibiting city employees from engaging in political activities, such as placing campaign signs in their yards. Plaintiff, however, was not a city employee; she was only married to one. *Id.* at 972-73. Although the provision was enforceable only against city employees, the Court reasoned that plaintiff "asserts her own rights" rather than just "those of her husband" because "[s]he has her own rights to participate in political activities, and if her husband were disciplined or lost his job, the economic adverse effect on her would be clear." *Id.* at 973.

The same logic applies here. A.C. has an interest in a supportive environment in which she can freely express her identity as a transgender girl. Disciplining any teacher who facilitates such an environment directly frustrates that interest. *Cf. Price v. Denison Indep. Sch. Dist.*, 694 F.2d 334, 375 (5th Cir. 1982) (students and parents had standing to challenge schools' racial discrimination in hiring teachers because students had an interest in being taught by a diverse faculty); *Castaneda v. Pickard*,

648 F.2d 989, 999-1000 (5th Cir. 1981) (same); *Otero v. Mesa Cnty. Valley Sch. Dist. No. 51*, 568 F.2d 1312, 1314-15 (10th Cir. 1977) (same).

Finally, the State has authority to enforce the Don't Say Gay/Trans Provision and is a proper defendant. Iowa law imposes on Defendants Iowa State Board of Education and Iowa Department of Education—which are accountable to Defendant Governor Reynolds—a duty to create and enforce, respectively, curricular standards in line with SF496. *See* Iowa Code § 256.11 unnumbered paragraph, (2)-(3), (9)-(10). This case is therefore distinguishable from *Arc of Iowa v. Reynolds*, 94 F.4th 707 (8th Cir. 2024), where the Court concluded that the State—specifically, the Governor and the Director of the Department of Education—had no "duty to enforce" the challenged statute and schools remained free to follow the federal protections asserted. *Id.* at 711.

### B. All Student Plaintiffs Have Standing to Challenge the Book Ban.

The State's challenge to Student Plaintiffs' standing to challenge the Book Ban is based almost entirely on the proposition that the government-speech doctrine applies to the removal of books from school libraries. But as discussed above, that position is incorrect. *See supra* Section I.D.

Student Plaintiffs have satisfied the elements of standing. They demonstrated a concrete injury in fact because they have consistently stated that they wish to check out books with LGBTQ+ themes and characters but are unable to do so. *See*

App.174, R.Doc.2-6, ¶ 11 (Doe Decl.); App.201-02, R.Doc.2-9, ¶ 7 (R. Smith Decl.); App.180, R.Doc.2-7, ¶ 7 (T.S. Decl.); App.141, R.Doc.2-2, ¶ 12 (B.F. Decl.). That injury is traceable to the Book Ban because schools have removed books as a direct result of the State's threatened enforcement of SF496. And it is redressable by the injunctive relief Student Plaintiffs seek because schools would both stop removing books and would be required to return any books caught in the confusion to the bookshelves.

### C. ISS Has Standing to Challenge the Book Ban and the Don't Say Gay/Trans Provision.

Plaintiff ISS has direct standing to challenge the Book Ban and Don't Say Gay/Trans Provision and as the representative of its member students and GSAs.[19]

ISS has direct standing for two reasons. First, it has diverted resources that otherwise could have been spent fulfilling the organization's goals to counteract the State's unlawful actions. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Prior to SF496's enactment, ISS devoted most of its advising resources to helping students with the logistics of establishing and running GSAs and providing anti-bullying materials. *See* App.190-91, R.Doc.2-8, ¶ 16 (ISS Decl.). Now, ISS has

---

[19] Although the district court did not specifically address ISS's standing, Plaintiffs briefed it before the district court, and this Court "may affirm on any ground supported by the record." *Duffner v. City of St. Peters*, 930 F.3d 973, 976 (8th Cir. 2019); *see also Duffie v. City of Lincoln*, 834 F.3d 877, 882-83 (8th Cir. 2016) (arguments preserved for appeal if notice below sufficient to other parties).

been forced to divert its resources toward answering member GSAs' and students' questions about SF496 and advising them on how to continue their operations despite the law's provisions, especially in K-6 schools. *See* App.192, 196, R.Doc.2-8, ¶¶ 20, 32-33 (ISS Decl.). Because of SF496, ISS is spending its time and money on additional tasks that directly impact its bottom line.

Second, ISS has suffered direct injury because SF496 has frustrated its mission to provide safe, supportive, and nurturing learning environments and communities for LGBTQ+ and allied youth through education, outreach, advocacy, and direct services. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261-62 (1977); *N.Y. Civ. Liberties Union v. N.Y. City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). The State's threatened enforcement of SF496 has disrupted and continues to discourage the formation of member GSAs, deterred voluntary associations of LGBTQ+ and allied students, and made it more difficult to gather data on LGBTQ+ youth. App.186-93, 196, R.Doc.2-8, ¶¶ 3-7, 11-19, 23, 31 (ISS Decl.). The diversion of resources and mission frustration both support ISS's direct standing.

ISS also satisfies the three requirements for representational standing because: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual

members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 199 (2023) (citation omitted); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

First, ISS's members otherwise would have standing to sue in their own right. Regarding the Don't Say Gay/Trans Provision, ISS member GSAs have closed or had to modify their meetings. *See* App.193-94, R.Doc.2-8, ¶¶ 22-27 (ISS Decl.); *see also supra* Section IV.A. As for the Book Ban, ISS member students want to check out books but cannot. *See* App.174, R.Doc.2-6, ¶ 11 (Doe Decl.); App.201-02, R.Doc.2-9, ¶ 7 (R. Smith Decl.); App.192, R.Doc.2-8, ¶ 18 (ISS Decl.) (identifying James Doe and Robert Smith as ISS members); *see also supra* Section IV.B. Second, the interests ISS seeks to protect are germane to the organization's purpose: "to provide safe, supportive, and nurturing learning environments and communities for LGBTQ+ youth and their allies." App.186, R.Doc.2-8, ¶ 3 (ISS Decl.). Finally, this case does not turn on any factual or legal dispute specific to any individual member GSA or member. SF496 categorically bans a broad array of conduct in direct violation of the First Amendment. Because of this overbroad curtailment of speech, the evidence does not need to come from any particular member.

## V. PLAINTIFFS ESTABLISHED AN IMMINENT THREAT OF IRREPARABLE HARM.

A "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Powell v. Noble*, 798 F.3d 690, 702

(8th Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The Book Ban and Don't Say Gay/Trans Provision, if enforced, would deprive Student Plaintiffs of their First Amendment rights.

The timing of a preliminary injunction motion does not negate irreparable harm. Although SF496 was "effective" in June 2023, the school year did not start until August 2023, and the Book Ban was not set to be completely effective until January 1, 2024. Plaintiffs could not understand the effects of SF496 until schools began implementing their compliance plans. Once these plans emerged, Plaintiffs learned of the full extent of SF496's arbitrary enforcement and filed their Complaint, including a void for vagueness claim. Further, with respect to the Book Ban, the possibility that students might purchase books elsewhere is no replacement "for access to books" in school libraries. *See Little v. Llano Cnty.*, No. 22-cv-424, 2023 WL 2731089, at *12 (W.D. Tex. Mar. 30, 2023), *appeal docketed*, No. 23-50224 (5th Cir. Apr. 4, 2023).

## VI. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH IN STUDENT PLAINTIFFS' FAVOR.

The balance of the equities and public interest favor the district court's preliminary injunction. It is always "in the public interest to prevent the violation of a party's constitutional rights." *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) (citation omitted). And nothing about the preliminary injunction prevents parents from requesting that materials be

removed from libraries or not be checked out to their children or forbidding their children from participating in any extracurricular activities. Further, it already was a criminal offense to disseminate obscene material to minors before SF496's enactment. *See* Iowa Code § 728.2. Nothing in the preliminary injunction prevents authorities from prosecuting anyone under the relevant statute.

## CONCLUSION

For the foregoing reasons, Plaintiffs-Appellees respectfully request that the Court affirm the district court's order granting the preliminary injunction.

Dated: April 10, 2024

Respectfully submitted,

/s/ Laura J. Edelstein

Laura J. Edelstein

Thomas D. Story, AT0013130
Shefali Aurora, AT0012874
Rita Bettis Austen, AT0011558
AMERICAN CIVIL LIBERTIES UNION
OF IOWA FOUNDATION
505 Fifth Avenue, Suite 808
Des Moines, IA 50309
(515) 243-3988
thomas.story@aclu-ia.org
shefali.aurora@aclu-ia.org
rita.bettis@aclu-ia.org

Camilla B. Taylor
Kara Ingelhart
Nathan Maxwell*
LAMBDA LEGAL DEFENSE AND
 EDUCATION FUND, INC.

Laura J. Edelstein
Katherine E. Mather
JENNER & BLOCK LLP
455 Market Street, Suite 2100
San Francisco, CA 94105
(628) 267-6800
LEdelstein@jenner.com
KMather@jenner.com

Anna K. Lyons
Effiong K. Dampha
JENNER & BLOCK LLP
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071-2246
(213) 239-5100
ALyons@jenner.com
EDampha@jenner.com

65 E. Wacker Drive, Suite 2000
Chicago, IL 60601
(312) 663-4413
ctaylor@lambdalegal.org
kingelhart@lambdalegal.org
nmaxwell@lambdalegal.org

Karen L. Loewy
Sasha J. Buchert
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
kloewy@lambdalegal.org
sbuchert@lambdalegal.org

Joshua J. Armstrong
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
JArmstrong@jenner.com

Daniel R. Echeverri
Christopher J. Blythe
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
DEcheverri@jenner.com
CBlythe@jenner.com

*Member of the Arizona bar.
Practicing under the supervision of a
member of the Illinois bar.*

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

1.      Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(f), the brief contains 12,987 words.

2.      This brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font. As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

3.      Pursuant to Eighth Circuit Local Rule 28A(h), undersigned counsel hereby certifies that the brief has been scanned for viruses and that the brief is virus-free.

Dated: April 10, 2024

/s/ Laura J. Edelstein
_____
Laura J. Edelstein

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that pursuant to Circuit Rule28A(d) and within five days of receipt of the notice of this Court's acceptance of the brief for filing, I will cause ten (10) copies of the brief to be transmitted to the Court via UPS overnight delivery, delivery charge prepaid, and I will cause one (1) copy of the brief to be served on each party separately represented via First Class mail, postage prepaid by placing a copy in a properly addressed envelope, and depositing it in a U.S. mail receptacle at 353 N. Clark Street, Chicago, Illinois.

Dated: April 10, 2024

/s/ Laura J. Edelstein
_____
Laura J. Edelstein